DUKE UNIVERSITY v. THE ST. PAUL MERCURY INSURANCE COMPANY
AND CONTINENTAL CASUALTY COMPANY

No. 8814SC947

(Filed 3 October 1989)

1. **Insurance § 149— refusal of insurer to defend—"no action" clause—beginning of limitations period**

   The "no action" clause in defendant's liability policy, which precluded a suit by the insured against the insurer until the insured's liability had been determined by judgment or settlement, did not apply in this direct suit brought by plaintiff insured against defendant insurer for breach of defendant's obligation to defend, and the limitations period therefore did not begin to run on the date that plaintiff paid its final legal fees and defendant refused to pay the total costs of plaintiff's defense of the underlying suit.

2. **Insurance § 149; Limitation of Actions § 4.3— refusal of insurer to defend—limitation of three years from date each legal expense is incurred to bring suit**

   Pursuant to the three-year statute of limitations affecting contracts under N.C.G.S. § 1-52(1), an insured has three years from the date each legal expense is incurred to bring suit against the insurer for its refusal to defend the insured.

3. **Limitation of Actions § 15— refusal of insurer to defend—settlement negotiations—no equitable estoppel to plead statute of limitations**

   In an action to recover legal fees incurred in the underlying action which defendant insurer refused to defend, there was no merit to plaintiff's contention that defendant was equitably estopped to plead the statute of limitations, since the parties' participation in settlement negotiations did not alone waive defendant's right to assert the statute of limitations; even after the prospect of a partial settlement fell through, plaintiff still waited over eleven months before filing this suit; and plaintiff was not induced by any false representations by defendant that might have lulled it into believing that defendant would not assert the statute of limitations.

DUKE UNIVERSITY v. ST. PAUL MERCURY INS. CO.

[95 N.C. App. 663 (1989)]

**4. Insurance § 149— insurer's refusal to defend—plaintiff's delay in notifying insurer—delay justified**

The trial court properly refused to dismiss plaintiff's action to recover attorney's fees on the ground that plaintiff delayed in notifying its insurer, where there was a significant delay of fifteen months between the time the underlying suit was filed against plaintiff and the time plaintiff notified defendant of the suit; the trial court properly found that plaintiff did not purposely and knowingly fail to notify defendant between the date of the underlying lawsuit and the date plaintiff's errors and omissions insurer advised plaintiff of defendant's possible liability since plaintiff was not aware until the latter date that defense of the underlying action was covered by defendant's general liability policy; the trial court properly found that the three and one-half month delay after plaintiff was advised of defendant's possible liability and notification to defendant was also in good faith since the delay was attributable to plaintiff's quarterly system of reporting claims to its insurers; and defendant failed its burden to show that plaintiff's good faith delay materially prejudiced defendant's duty to defend the underlying suit.

**5. Insurance § 149— insurer's duty to defend—no duty to pay legal costs of counterclaims**

In an action to recover legal fees from an insurer which had refused to defend, the trial court correctly disallowed plaintiff's legal expenses incurred in connection with the prosecution of its counterclaims; however, the trial court erred in disallowing plaintiff's recovery of legal expenses incurred in connection with its defense against injunctive relief where the complaint filed in the underlying action requested both injunctive relief and compensatory damages.

**6. Insurance § 149— insurer's refusal to defend—action to recover legal fees—insurer entitled to credit from settlement payment with another insurer**

In an action to recover legal fees from an insurer which had refused to defend, defendant was legally entitled to credit from plaintiff's settlement payment with another insurer to the extent that the settlement covered the same legal expenses awarded against defendant.

DUKE UNIVERSITY v. ST. PAUL MERCURY INS. CO.

[95 N.C. App. 663 (1989)]

APPEAL by plaintiff Duke University and cross-appeal by defendant St. Paul Mercury Insurance Company from *Hobgood (Robert H.), Judge*. Judgment entered 21 December 1987 and amended 30 March 1988 in Superior Court, DURHAM County. Heard in the Court of Appeals 11 April 1989.

*Maxwell, Martin, Freeman and Beason, P.A., by James B. Maxwell and Alice Neece Moseley, for plaintiff Duke University.*

*Patterson, Dilthey, Clay, Cranfill, Sumner & Hartzog, by Robert M. Clay and Theodore B. Smyth, for defendant St. Paul Mercury Insurance Company.*

GREENE, Judge.

This appeal arises from a declaratory judgment action brought by Duke University ("Duke") against its general liability insurer, St. Paul Mercury Insurance Company ("St. Paul"), and its "errors and omissions" insurer, Continental Casualty Company ("CCC"). Duke originally sued both defendants to recover a total of $51,477.99 in attorney's fees Duke incurred as a defendant in a lawsuit involving a psychiatric hospital owned by Duke (the "underlying action"). The underlying action arose from Duke's proposed sale of the psychiatric hospital to a third party, and the disbursement of various funds and accounts among the two plaintiffs, Duke, and nineteen other defendants who had a financial involvement or interest in the hospital. In the underlying action, Duke counterclaimed against the two doctor-plaintiffs for intentional torts including defamation, interference with contract, and unfair trade practices. Under Duke's policy with CCC, Duke would retain counsel acceptable to CCC, and CCC would reimburse Duke for the legal expenses incurred after the matter was concluded. Duke initially believed the underlying suit would be covered by its insurance policy with CCC. Duke therefore engaged the legal services of Powe, Porter, Alphin and Whichard, P.A. (now Moore and Van Allen), to represent Duke in the underlying action.

The underlying action progressed in federal court from July 1980 through June 1981. At that time, the senior claim representative for CCC informed Duke that its general liability policy with St. Paul could possibly obligate St. Paul to provide a defense of the underlying suit. The CCC claim representative's letter was turned over to Jeffrey Potter, an attorney in the office of the Duke University counsel generally responsible for matters involv-

ing insurance claims. Mr. Potter's office procedure typically called for quarterly reports to Duke's insurance carriers. On 18 September 1981 (the next quarterly period for reporting), Mr. Potter officially notified St. Paul about the underlying action and requested St. Paul's assistance. At that time, Duke had already incurred approximately $29,000 in legal fees in the underlying action. On 24 September 1981, St. Paul sent Duke a letter reserving its rights based on the possible lack of coverage and Duke's late notice; however, St. Paul proceeded with its investigation of the underlying claim. On 19 October 1981, St. Paul informed Duke it had no coverage, and thus St. Paul refused to provide legal defense in the underlying suit.

The underlying suit was resolved on 16 July 1982, and all legal matters relating to settlement were concluded in January 1983. CCC and St. Paul both refused to pay Duke's legal expenses incurred in the underlying action. St. Paul contended it had no duty because its policy did not cover the claims and counterclaims pled in the underlying action, and Duke had breached the policy by not immediately notifying St. Paul of the underlying action. CCC contended it did not have primary coverage, and it was St. Paul's obligation to defend the lawsuit. Therefore CCC had only limited liability for certain other claims alleged in the underlying action. On 3 August 1984, St. Paul proposed a compromise to Duke by tendering fifty percent of the legal expenses incurred by Duke after September 1981 which totaled approximately $11,000. Duke rejected that settlement offer and ultimately instituted this action on 12 July 1985 to collect its full legal fees of over $51,000. Prior to trial, Duke reached a settlement with CCC whereby Duke released CCC from financial responsibility in return for a compromise payment of $20,000.

St. Paul moved to dismiss Duke's claim for attorney's fees on the grounds Duke was barred by limitations and had breached its policy with St. Paul by not "immediately" notifying St. Paul of the underlying suit as required by the policy. The trial court denied St. Paul's motion to dismiss, entered various findings reciting the facts stated above, and also found that, of the legal fees incurred from July 1980 through September 1981, $13,898.13 of those fees were incurred defending matters covered by the St. Paul policy. The trial court further found that, of the legal fees incurred between 10 October 1981 through January 1983, $8,990.70 were in-

DUKE UNIVERSITY v. ST. PAUL MERCURY INS. CO.

[95 N.C. App. 663 (1989)]

curred in defending matters covered by the St. Paul policy. The trial court concluded:

1. This action is not barred by the statute of limitations.

2. St. Paul was not notified by Duke University of the underlying action until September 21, 1981, and there was a delay of 15 months from June 27, 1980, the date the underlying action was filed, until September 21, 1981 in notifying the insurance company.

3. Duke did not purposely and knowingly fail to notify St. Paul Mercury Insurance Company of the lawsuit filed against it on July 2, 1980 by Hal G. Gillespie and Thomas A. Smith. Said underlying action involved complex legal issues and Duke reasonably believed the action, when initially filed, was not covered by the general liability policy issued by St. Paul. Duke was not aware of any possible fault for failure to notify St. Paul. The delay between the time the underlying action was filed and the time CNA suggested Duke contact St. Paul on June 1, 1981 was in good faith.

4. The delay between June 1, 1981 when a representative of CNA advised Duke that CNA believed there were allegations in the underlying lawsuit of Gillespie and Smith which could or might possibly be covered by St. Paul and the date Duke notified St. Paul on September 15, 1981 of the underlying action was also in good faith: there was no deliberate decision on behalf of Duke to not notify St. Paul, and Duke was not aware of possible fault for failure to notify during this time.

5. St. Paul was not prejudiced by the delay in notification of the underlying lawsuit until September 1981. The results obtained in the underlying lawsuit were favorable to the insured, Duke University, and the legal representation by the law firm, Powe, Porter, Alphin and Whichard, P.A., which had been employed by Duke and was a firm that St. Paul itself had from time to time used, was effective.

6. St. Paul's duty to defend was unaffected by the delay in notifying St. Paul of the underlying action.

7. The legal fees rendered by Powe, Porter, Alphin and Whichard, P.A. to Duke University in regard to the lawsuit brought by Gillespie and Smith were reasonable and justified.

8. The St. Paul policy did offer coverage for certain claims alleged in the underlying lawsuit brought by Gillespie and Smith including allegations of wrongful eviction, defamation of character, and mental anguish.

9. As between The St. Paul Mercury Insurance Company and Continental Casualty Company, St. Paul was the primary insurer in the underlying action brought against Duke University by Gillespie and Smith.

10. St. Paul is not entitled to credit against any amount it owes Duke for the cost of defense of the underlying action for any payment Continental may have given Duke in order to settle Duke's claim against it and in order to be released from this action.

11. Between July 2, 1980 and January 1983, Duke University incurred legal fees and expenses of $51,460.73 which were reasonable and necessary for the cost of defense incurred in defending the lawsuit and in prosecuting Duke's counterclaims. Of that sum, $22,888.83 were reasonably incurred on behalf of Duke University in defense of claims in which St. Paul provided primary coverage under its policy of general liability insurance issued to Duke University.

NOW THEREFORE, it is hereby ordered, adjudged and decreed that Duke University shall be entitled to recover from the St. Paul Mercury Insurance Company the sum of $22,888.83 plus interest from July 16, 1982 to be assessed by the Clerk of the Court as provided by law.

Pursuant to the parties' agreement, the trial court subsequently amended its judgment under Rule 60(b) and additionally found that:

1. Of the total attorneys' fees paid by plaintiff in the underlying action, only $22,888.83 were incurred for the defense of that action, as distinguished from attorneys' fees incurred for the prosecution of counterclaims, temporary restraining orders, and protection of plaintiff's proprietary rights in the hospital in question and certain bank accounts and funds.

2. Of the $22,888.83 in defense costs incurred, plaintiff has recovered, by settlement with former defendant Continental Casualty Company, the sum of $20,000.00 in reimbursement for such defense costs.

**DUKE UNIVERSITY v. ST. PAUL MERCURY INS. CO.**

[95 N.C. App. 663 (1989)]

3. Defendant is entitled to a credit or setoff against the verdict and judgment heretofore rendered, in the sum of $20,000.00. To rule otherwise would permit plaintiff to make a double recovery.

4. Interest on the judgment should run from February 9, 1983, rather than from July 16, 1982, as the plaintiff had not completed its payment of attorneys' fees to its counsel in the underlying action until February 9, 1983.

Based on these new findings, Duke's original award of $22,888.83 was reduced to $2,888.83. St. Paul and Duke both appeal.

---

These facts present the following issues: I) whether the trial court (A) erroneously denied St. Paul's motion to dismiss based on limitations, and (B) whether St. Paul was equitably estopped to assert the defense of limitations; II) whether the trial court erroneously failed to dismiss Duke's claim based on St. Paul's "late notice" defense; and III) whether the trial court's amended judgment (A) properly refused to award Duke the legal fees it incurred in prosecuting its counterclaims and defending against injunctive relief, and (B) properly credited St. Paul with the $20,000 settlement reached between Duke and CCC.

I

A

[1] St. Paul first argues that Duke's claim was barred by the three-year statute of limitations for contracts under Section 1-52(1). N.C.G.S. Sec. 1-52(1) (1983). Duke filed its complaint for declaratory judgment and reimbursement of attorney's fees on 12 July 1985. St. Paul contends the three-year statute of limitations commenced on 19 October 1981 when it notified Duke in writing that "the St. Paul Insurance Companies will be unable to take over the defense of any part of this matter or provide coverage for same." *See Gedeon v. St. Farm Mut. Auto Ins. Co.*, 261 F. Supp. 122, 123 (W.D. Pa. 1966), *aff'd in part, rev'd in part on other grounds*, 386 F.2d 600 (3d Cir. 1968), *cert. denied*, 392 U.S. 937, 20 L.Ed.2d 1395 (1968) (breach of duty to insured occurs as soon as defendant declines defense of suit against insured); *see also Schimmer v. Wolverine Ins. Co.*, 54 Mich. App. 291, 220 N.W.2d 772, 775-76 (1974) (limitation commences when insurer refuses to defend). However, Duke contends the limitations period commenced at the earliest on 16 July

1982, the date the underlying suit against it was settled. In fact, Duke contends the better-reasoned view is that the limitations period did not commence until 9 February 1983 when it paid its final legal fees and St. Paul refused to pay the total costs of Duke's defense of the underlying suit.

Two authorities on insurance law state that, where a liability insurer refuses to defend its insured, the cause of action against the insurer commences on the date the final judgment is obtained against the insured, rather than on the date the insurer refuses to defend. 18A Rhodes, *Couch on Insurance 2d* Sec. 75:111 (1983 rev. ed.); 20A Appleman, *Insurance Law and Practice* Sec. 11614 (1980); *see also id.* at 478 n. 10 (criticizing *Schimmer* decision). The statements by both commentators are apparently based on the notion that the typical "no action" clause normally precludes a suit by the insured against the insurer until the insured's liability has been determined by judgment or settlement. *E.g., Ginn v. State Farm Mut. Auto Ins. Co.*, 417 F.2d 119 (5th Cir. 1969) (given "no action" clause, statute did not commence until conclusion of litigation against insured). The "no action" clause in St. Paul's liability policy is typical and states:

> No one can sue us on a liability claim until the amount of the protected person's liability has been finally decided either by trial or by written agreement signed by the protected person, by us and by the party making the claim. Once liability has been determined by judgment or by written agreement, the party making the claim may be able to recover under this policy, up to the limits of your coverage. But that party can't sue us directly or join us in a suit against the protected person until liability has been so determined. . . .

Thus, under *Ginn* and such cases, the statute of limitations does not commence on a claim arising from the insurer's duty to defend until a judgment has been entered or settlement reached which determines the insured's liability.

However, it appears most courts have held, contrary to *Ginn*, that the "no action" clause does not apply to a direct suit brought by the insured against the insurer for breach of the insurer's obligation to defend. *E.g., Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co.*, 664 F.2d 252, 254 (10th Cir. 1981) (collecting cases). As the Tenth Circuit observed in *Paul Holt Drilling*:

**DUKE UNIVERSITY v. ST. PAUL MERCURY INS. CO.**

[95 N.C. App. 663 (1989)]

If the no action clause applies to the insureds' claims, when would it no longer bar suit to recover for legal expenses they bear when the insurer wrongfully refuses to defend? Unless insureds refuse to pay their attorney, no judgment for those fees will ever be entered against them. There will never be a written agreement of 'the insured, the claimant and the company' with respect to the attorneys' fees and litigation costs. Additionally, 'claimant' in this context obviously refers to a third party claimant against the insured.

*Id.* at 255 (footnote omitted).

Furthermore, the courts of this state have consistently held that the "no action" clause will not bar the insured's immediate suit against the insurer for breaching the duty to defend where the insurer unjustifiably refuses to defend the insured. *E.g., Nixon v. Liberty Mut. Ins. Co.*, 255 N.C. 106, 110, 120 S.E.2d 430, 433-34 (1961); *Indiana Lumbermen's Mut. Ins. Co. v. Champion*, 80 N.C. App. 370, 375-76, 343 S.E.2d 15, 18-19 (1986). The insurer's refusal to defend an underlying action is "unjustified" if it is determined that the action is in fact within the coverage of the liability policy. *Indiana Lumbermen's Mut. Ins. Co.*, 80 N.C. App. at 376, 343 S.E.2d at 19. The trial court below ruled that St. Paul was obligated to defend Duke insofar as the St. Paul liability policy covered claims for wrongful eviction, defamation of character, and mental anguish. St. Paul does not assign error to that conclusion nor does it argue in its brief that the conclusion was erroneous. Since St. Paul's refusal to defend was therefore unjustified, Duke was not contractually bound by the "no action" clause to delay its suit until judgment or settlement of the underlying action. Therefore, the date the bar of limitations commenced was *not* delayed until the conditions of St. Paul's "no action" clause had been fulfilled.

We must nevertheless determine when the limitations period did commence on Duke's claim. The possibilities suggested by the Tenth Circuit are that an insurer breaches its obligation to defend at the time: (1) the insured first incurs legal expenses, (2) at the time the underlying litigation is completed, or (3) continuously or periodically during the course of the litigation. *Paul Holt Drilling, Inc.*, 664 F.2d at 255. The statute of limitations for contracts in this state commences on the date the contractual promise is broken. *Penley v. Penley*, 314 N.C. 1, 20, 332 S.E.2d 51, 62 (1985).

[2]   We believe St. Paul's duty to defend under the liability policy is a continuing obligation to defend throughout the course of the underlying litigation. *See Paul Holt Drilling, Inc.*, 664 F.2d at 255; *Coblentz v. American Surety Co.*, 416 F.2d 1059, 1062 (5th Cir. 1969); *Phillips v. Penland*, 196 N.C. 425, 147 S.E. 731 (1929) (under contract contemplating continuing services, statute of limitations commences at time of each expenditure). Each legal expenditure incurred as a result of the insurer's refusal to defend creates a new right in the insured to recover such legal expenditures from the insurer. Thus, given the three-year statute of limitations affecting contracts under Section 1-52(1), an insured has three years from the date each legal expense is incurred to bring suit against the insurer for its refusal to defend the insured.

Under *Penley*, St. Paul breached its promise to defend Duke on 19 October 1981 when it notified Duke in writing that it would not provide a defense of the underlying action. Duke had three years from 19 October 1981 to sue St. Paul for the legal expenditures it incurred as of that date. However, Duke did not commence this lawsuit until 12 July 1985. Therefore, assuming St. Paul was not estopped to plead limitations, Section 1-52(1) bars Duke's recovery of any legal expenses incurred before 12 July 1982, i.e., three years before the date it commenced suit on 12 July 1985.

B

[3]   However, Duke argues the trial court made findings sufficient to show Duke was led to believe by St. Paul's conduct that St. Paul would pay some, if not all, of the costs of Duke's legal defense. Duke therefore contends St. Paul is equitably estopped to plead the statute of limitations since Duke's delay was based on its reasonable belief it would receive payment without resorting to legal action. Our courts have recognized that equitable estoppel may be invoked in a proper case to bar a defendant from relying upon the statute of limitations. *E.g., Nowell v. The Great Atlantic & Pacific Tea Co.*, 250 N.C. 575, 108 S.E.2d 889 (1959). Equity will deny the right to assert the defense of limitations when delay has been induced by acts, representations, or conduct, the repudiation of which would amount to a breach of good faith. *Id.* As stated by several commentators, "In order to warrant the application of the doctrine of estoppel, it must be shown that the conduct of the party against whom waiver of the . . . limitation is claimed is such as to cause the adverse party to change his position by

DUKE UNIVERSITY v. ST. PAUL MERCURY INS. CO.

[95 N.C. App. 663 (1989)]

lulling him into false security, and causing him to delay or waive assertion of his rights to his damage." 18A Rhodes, *Couch on Insurance 2d* Sec. 75:183 at 177 (1983) (footnote omitted).

We note that Duke did not plead any facts showing St. Paul was equitably estopped from asserting the statute of limitations. Waiver and estoppel are affirmative defenses which must be pled with certainty and particularity and established by the greater weight of the evidence. N.C.G.S. Sec. 1A-1, Rule 8(c) (1983); *Rivenbark v. Moore*, 57 N.C. App. 339, 291 S.E.2d 293 (1982). Although the failure to plead an affirmative defense ordinarily results in its waiver, the parties may still try the issue by express or implied consent. *Nationwide Mut. Ins. Co. v. Edwards*, 67 N.C. App. 1, 6, 312 S.E.2d 656, 660 (1984); *see* N.C.G.S. Sec. 1A-1, Rule 15(b) (1983). As the record and exhibits on appeal show, Duke introduced evidence of significant negotiations between the parties after St. Paul's October 1981 rejection letter. It appears some evidence was introduced at trial pertinent to the elements of equitable estoppel. *See Blizzard Building Supply Co. v. Smith*, 77 N.C. App. 594, 335 S.E.2d 762, *disc. rev. denied*, 315 N.C. 389, 339 S.E.2d 410 (1986) (summarizing elements of estoppel).

The trial court made two findings pertinent to the issue of equitable estoppel. First, the trial court found that "correspondence and discussions continued between representatives of Duke and St. Paul [after St. Paul had formally refused to defend on 19 October 1981], and in a letter from St. Paul to Duke dated December 23, 1981, St. Paul conceded that there was the 'possibility' of coverage under the St. Paul policy." Second, the trial court found that, "on August 3, 1984, St. Paul proposed a compromise to Duke by tendering fifty percent of the legal expenses incurred by Duke after September, 1981 were approximately $11,000." However, these findings are not sufficient to show St. Paul should be equitably estopped from pleading the statute of limitations. The parties' participation in settlement negotiations does not alone waive St. Paul's right to assert the statute of limitations. "Mere negotiations with a possible settlement unsuccessfully accomplished is not that type of conduct designed to lull the claimant into a false sense of security so as to constitute an estoppel by conduct thus precluding an assertion of . . . [limitations] by the insured." *Desai v. Safeco Ins. Co. of America*, 173 Ga. App. 815, 328 S.E.2d 376, 379 (1985). It is true that St. Paul wrote Duke on 3 August 1984 offering fifty percent of the $21,000 in legal expenses incurred after St. Paul

received notice of the underlying action in September 1981. St. Paul's letter stated that the offer "represents our pro-rata share [with CCC] and . . . is not to be construed as an admission of coverage." This letter does not constitute an affirmative statement by St. Paul that would lead Duke to believe St. Paul intended to waive its assertion of the statute of limitations if the settlement offer was not accepted. It is apparent that St. Paul's offer to pay approximately $11,000 of Duke's total claim of over $50,000 did not lull Duke into thinking it would recover its total legal costs without instituting this action. As Mr. Potter stated in his deposition:

> We weren't trying to independently settle with St. Paul. We were trying to get the entire amount of the defense costs back . . . As they typically do, you know, they were trying to buy their way out . . . . *It was never my purpose to cut a separate deal with St. Paul and then get the rest from CNA. I wanted the two companies to make me a joint proposal that would allow me to get a hundred percent of my costs.*

(emphasis added). Even after the prospect of a partial settlement dimmed in 1984, Duke still waited over eleven months before filing this suit. As the Georgia Court of Appeals held in a case on similar facts, plaintiffs "were aware before the period of . . . [limitations] had elapsed that if they intended to pursue their *whole claim*, they would have to file suit. This they did not accomplish . . . ." *Desai*, 328 S.E.2d at 379 (emphasis added).

This is not a case where the insurer expressly stated that it would waive a contractual limitation or that the insured's claim would be paid. *Cf. Vail v. Vermont Mut. Fire Ins. Co.*, 14 N.C. App. 726, 727-28, 189 S.E.2d 527, 528 (1972) (express statement); *Pennell v. Security Ins. Co.*, 18 N.C. App. 465, 467, 197 S.E.2d 240, 242 (1973) (insurer repeatedly told insured that claim would be paid). This is not a case where the party estopped did not deny liability for almost three years and made representations during that period which led the plaintiff to believe its entire bill would be paid. *See Duke Univ. v. Stainback*, 320 N.C. 337, 357 S.E.2d 690 (1987). Duke has not alleged that St. Paul misrepresented or concealed any material fact as required for equitable estoppel. Duke was not induced by any false representations by *St. Paul* that might have lulled it into believing that St. Paul would not assert the statute of limitations. Instead, Mr. Potter relied on *his own* independent assumptions that St. Paul's October 1981 rejec-

tion letter was just a "form letter" and that St. Paul was not serious in rejecting Duke's claim:

> I took [the rejection letter] as a form letter. . . . *[M]y impression* in talking with *my* insurance manager, Rose Morrow, was that they assumed this was some malpractice matter and they had sent us the wrong form letter. I may or may not be right about that . . . .
>
>    . . . .
>
> Q So although she wrote this letter, the impression you got from her was that this was just a form letter?
>
> A The impression I got after looking at the letter and talking to [my] insurance manager . . . was that it was a form letter and they had not paid careful attention to what we had asked them to do.
>
>    . . . .
>
> Q You keep mentioning this is a form letter. You don't yourself have any personal knowledge of what went into the drafting of that letter or whether it was custom drafted for you or whether it was straight off a word processor, I take it?
>
> A Right.
>
>    . . . .
>
> Q But, nevertheless, after receiving [the rejection letter], St. Paul did enter into some form of settlement negotiations with you to try to reach some accommodation which, I take it, ultimately was unsuccessful and resulted in this litigation?
>
> A Yeah. They tried to convince me . . . there was no coverage. We went back and forth a couple of times; they finally came down that there *conceivably* could be *possibly* coverage, which *I* took . . . meant yes in insurance parlance.

(emphasis added).

    Duke had the burden to show by the greater weight of evidence that St. Paul was equitably estopped from asserting the defense of limitations. *Cf. Lea Co. v. North Carolina Board of Transportation*, 308 N.C. 603, 629, 304 S.E.2d 164, 181 (1983) ("The statute of limitations having been pled, the burden was on the plaintiff to show that its claim for relief accrued within the time pre-

scribed."). However, neither the trial court's findings nor the evidence in the record shows that Duke met that burden. Accordingly, we hold Section 1-52(1) barred Duke's recovery of those legal expenses it incurred before 12 July 1982, i.e., three years before Duke filed its suit against St. Paul. Insofar as the trial court allowed legal expenses incurred *before* 12 July 1982, the trial court erred, and its award of legal fees must be reversed and remanded for new findings.

## II

[4] Irrespective of the statute of limitations, St. Paul also contends Duke's delay of almost fifteen months in notifying St. Paul of the underlying action bars Duke's suit since the insurance policy obligated Duke to "immediately forward . . . every demand, notice, summons, or other process" after a claim was made against Duke. St. Paul contends Duke's breach of this notice provision frustrated the purposes underlying its contractual right to defend the underlying suit. Citing *Great American Insurance Co. v. Tate Const. Co.*, 303 N.C. 387, 279 S.E.2d 769 (1981) (*"Great American I"*), and *Great American Insurance Co. v. Tate Const. Co.*, 315 N.C. 714, 340 S.E.2d 743 (1986) (*"Great American II"*), St. Paul contends it was excused from its duty to defend. In *Great American I*, our Supreme Court set forth a three-part test for determining whether the insured's failure or delay in giving notice required under the policy bars the insured's recovery against the insurer:

> When faced with a claim that notice was not timely given, the trier of fact must first decide whether the notice was given as soon as practicable. If not, the trier of fact must decide whether the insured has shown that he acted in good faith, e.g., that he had no actual knowledge that a claim might be filed against him. If the good faith test is met the burden then shifts to the insurer to show that its ability to investigate and defend was materially prejudiced by the delay.

*Great American I*, 303 N.C. at 399, 279 S.E.2d at 776. This three-part test was elaborated in *Great American II*:

> More precisely phrased, the first step in the *Great American* test simply requires the trial court to determine whether there has been any delay in notifying the insurer. In most instances, unless the insurer's allegations that notice was not timely are patently groundless, this first part of the test is met by the

**DUKE UNIVERSITY v. ST. PAUL MERCURY INS. CO.**

[95 N.C. App. 663 (1989)]

fact that the insurer has introduced the issue to the court. Therefore only the good faith and prejudice steps remain to be addressed by the trial court.

. . . .

[The] test of lack of good faith involves a two-part inquiry:

1) Was the insured aware of his possible fault and

2) Did the insured purposely and knowingly fail to notify the insurer?

Both of these are, in the legal sense of the term, "subjective" inquiries—they ask not what a reasonable person in the position of the insured would have known, but what the insured *actually did know*. Certainly, if the insured knows that he is liable or even that he will possibly be held liable, or that others claim that he is at fault, an untimely delay in notification of the insured is a delay without good faith.

The good faith test is phrased in the conjunctive: both knowledge *and* the deliberate decision not to notify must be met for lack of good faith to be shown.

*Great American II*, 315 N.C. at 719-20, 340 S.E.2d at 747 (emphasis in original) (footnotes omitted). If the insured's good faith delay is shown, then the burden of proof shifts to the insurer to show that it was prejudiced by the delay in notification. *Great American II*, 315 N.C. at 718, 340 S.E.2d at 746. The *Great American I* Court listed certain factors relevant to the determination of material prejudice to the insurer:

the availability of witnesses to the accident; the ability to discover other information regarding the conditions of the locale where the accident occurred; any physical changes in the location of the accident during the period of the delay; the existence of official reports concerning the occurrence; the preparation and preservation of demonstrative and illustrative evidence, such as the vehicles involved in the occurrence, or photographs and diagrams of the scene; the ability of experts to reconstruct the scene and the occurrence . . . .

. . .

Proof of existence of any of the above factors is not deter-
minative; the insurer must also show that the changed cir-
cumstance materially impairs his ability to investigate the claim
or defend and, thus, compare a viable defense. Often, proof
of the changed circumstance itself will give rise to an inference
of prejudice; for example, proof of an unavailability of a sole
independent eyewitness.

We do not intend the above list of factors to be exclusive.

303 N.C. at 398-99, 279 S.E.2d at 776.

The first step of the *Great American* three-part test is clearly
met in this case since there was a significant delay of fifteen months
between the time the underlying suit was filed against Duke and
the time Duke notified St. Paul of the suit. With respect to the
"good faith" portion of the test, the trial court separately discussed
two periods of the fifteen month delay. First, the trial court found
Duke did not purposely and knowingly fail to notify St. Paul be-
tween 2 July 1980 (the date of the underlying lawsuit) and 1 June
1981 (the date CCC advised Duke of St. Paul's possible liability)
since Duke was not aware until the latter date that defense of
the underlying action was covered by St. Paul's general liability
policy. The trial court was clearly correct in finding the first period
of delay was in good faith based on the evidence before it. The
record contains absolutely no evidence that Mr. Potter, Duke's
counsel in charge of these matters, was aware the general liability
policy might cover the underlying suit until notified by CCC. Since
the test is subjective, Duke's delay until 1 June 1981 was in good
faith. As to the delay between 1 June 1981 and the date Duke
notified St. Paul on 15 September 1981, the trial court found Duke
did not deliberately fail to notify St. Paul, and therefore the delay
occurred in good faith. We likewise believe on these facts that
Duke's delay after CCC advised it of St. Paul's possible liability
was also in good faith since the delay was attributable to Duke's
quarterly system of reporting claims to its insurers. While such
a system may be unwise or negligent, reliance on that system
does not constitute a deliberate failure to notify the insurer under
*Great American II.*

The final step of the test reveals St. Paul failed its burden
to show Duke's good faith delay materially prejudiced St. Paul's
duty to defend the underlying suit. While Duke had incurred substan-
tial legal expenses by the time it notified St. Paul, the underlying

DUKE UNIVERSITY v. ST. PAUL MERCURY INS. CO.

[95 N.C. App. 663 (1989)]

action had not been settled or otherwise determined at that time. St. Paul stated in its interrogatories that it was aware of no negligence in the handling of the underlying suit by Duke's attorneys. St. Paul's brief simply points to the "possibility" that it would have settled the case sooner had it been notified. That possibility is present in every suit arising from an insured's delay in notifying its insurer. St. Paul concedes that Duke's attorneys were competent to handle this matter and that St. Paul had employed the same attorneys in other cases. Furthermore, St. Paul did not attempt to involve itself in the settlement negotiations in any way after it learned of the underlying lawsuit.

St. Paul complains that Duke's total legal expenses of almost $50,000 exceeded by several thousand dollars the amount for which it settled the underlying lawsuit. However, based on this erroneous analysis, Duke's attorneys would not be paid at all if their settlement of the underlying lawsuit required Duke to pay nothing. Given the fact there were numerous corporate and individual defendants involved, we fail to see why Duke's eventual settlement of a $3,000,000 lawsuit for approximately $40,000 materially prejudiced St. Paul. We consequently hold St. Paul failed to carry its burden to show it was materially prejudiced by Duke's delay. We therefore affirm the trial court's refusal to dismiss the action on that ground.

III

Duke appeals the trial court's failure to make certain additional findings as well as those parts of the amended judgment that: (A) disallow Duke's recovery of legal expenses occurring in connection with its counterclaims and defense against injunctive relief in the underlying action, and (B) credit St. Paul with the $20,000 settlement Duke received from CCC. Since we are vacating the trial court's judgment and remanding for new findings on the limitations issue, we are not required to address Duke's objections to the adequacy of the trial court's findings. However, we will address those objections since they are highly likely to occur again on remand.

A

[5] We believe the trial court correctly disallowed Duke's legal expenses incurred in connection with the prosecution of its counterclaims. See generally 7C J. Appleman, Insurance Law and Practice Sec. 4681, at 7 (1979). We believe the correct rule on this issue has been stated by the following commentator:

DUKE UNIVERSITY v. ST. PAUL MERCURY INS. CO.

[95 N.C. App. 663 (1989)]

An insurer, being obligated only to defend claims brought 'against' the insured, is not required to bear the cost of prosecuting a counterclaim on behalf of the insured. Because of the compulsory counterclaim rule, however, the insurer should not be allowed to direct the counsel that it hires on behalf of the insured to ignore the existence of counterclaims. The assumption of the insured's defense necessarily entails an obligation not to conduct the defense in a manner that will prejudice the insured's rights. Failure to advise the insured of the existence of a counterclaim that, if not asserted, will be lost should constitute a breach of that obligation.

As a practical matter, therefore, when hiring defense counsel, the insurer should advise counsel that it will not bear the costs of prosecuting a counterclaim, but it should not attempt to limit the attorney in connection either with investigating and evaluating possible counterclaims or with giving the insured advice with respect to such claims. If it does, it should be deemed to have breached its duty to defend and, assuming the insured had a meritorious compulsory counterclaim that was lost as a result of the insurer's action, the insurer should be liable for the value of the barred claim.

A. Windt, *Insurance Claims and Disputes* Sec. 4.39 (1982). Since the St. Paul policy only obligates St. Paul to defend suits "against" Duke, and as there is no assertion by Duke that St. Paul attempted to limit Duke's prosecution of its counterclaims, we hold the trial court correctly refused to award Duke the legal fees it incurred in connection with prosecuting its counterclaims.

However, the trial court erred in disallowing Duke's recovery of legal expenses incurred in connection with its defense against injunctive relief. Since St. Paul's policy only obligates it to defend Duke against suits for "damages," it is true that a suit for purely injunctive relief would not obligate St. Paul to defend against the injunctive action. 7C Appleman, *Insurance Law and Practice* Sec. 4685, at 120-21. However, when the action is for both injunctive relief and compensatory damages, the insurer refuses to defend the action at its peril. *Id.; see also Waste Management of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 691 n. 2, 340 S.E.2d 374, 377 (1986) (insurer has duty to defend if complaint describes a "hybrid" of covered and non-covered claims). The complaint filed in the underlying action requested both injunctive relief and com-

DUKE UNIVERSITY v. ST. PAUL MERCURY INS. CO.

[95 N.C. App. 663 (1989)]

pensatory damages; therefore, St. Paul is liable for Duke's legal fees incurred in connection with the injunction proceedings.

B

[6] The trial court also found that, of the $22,888.83 in defense costs incurred, Duke had recovered a $20,000 compromise payment from CCC "in reimbursement for *such* defense costs." (Emphasis added.) The trial court then concluded St. Paul was entitled to a credit or setoff in the amount of that $20,000 payment: "To rule otherwise would permit plaintiff to make a double recovery." Duke contends the trial court's findings do not permit adequate appellate review of the trial court's construction of its settlement agreement with CCC. Duke further contends that crediting St. Paul with the $20,000 settlement payment is a windfall to St. Paul since the CCC payment was reimbursement for legal fees that were not covered by the St. Paul policy.

We first note that St. Paul has no statutory right to contribution under Section 1B-4(1), which provides that a release or covenant not to sue given to a person liable *in tort* reduces the claim against other tort-feasors. N.C.G.S. Sec. 1B-4(1) (1983). By its terms, Chapter 1B applies only in tort actions, not contract actions. *Holland v. Edgerton*, 85 N.C. App. 567, 569, 355 S.E.2d 514, 516 (1987).

However, the general rule as to avoidable consequences applicable in contract actions is stated as follows:

> [D]efendant in an action for breach of contract is entitled to show any matters which go to reduce the amount of loss actually suffered by plaintiff, provided such matters have a proximate relation to the contract . . . . Payment of compensation . . . to plaintiff by a third party on the same cause of action, or partial satisfaction from a third person against whom a claim for damages is made with respect to the same subject matter may be shown in reduction of damages for breach of contract.

25 C.J.S. *Damages* Sec. 97, at 1003-005 (1966) (footnotes omitted). In discussing fire insurance, the same treatise states that "where a property owner is entitled to protection against loss . . . under two contracts, one of which is a fire insurance policy, and . . . the owner recovers a portion of his loss from one, he can only recover the remainder of his loss from the other, and if he has been fully compensated by one he is not entitled to recover from

the other." 25 C.J.S. *Damages* Sec. 99(2), at 1016 (footnotes omitted). This analysis is consistent with case law in this state. *Cf. Nebel v. Nebel*, 223 N.C. 676, 686, 28 S.E.2d 207, 214 (1943) (plaintiff may prove equitable contribution where he has paid more than fair share of common debt burden); *Bumgardner v. Tomblin*, 63 N.C. App. 636, 643, 306 S.E.2d 178, 184 (1983). Thus, we conclude St. Paul was legally entitled to credit from the CCC settlement payment to the extent the $20,000 settlement covered the same legal expenses awarded against St. Paul.

Since the trial court reduced its award by the amount of legal fees incurred as result of Duke's counterclaims and injunctive relief defense, Duke argues St. Paul received a windfall because the settlement payments were intended to cover the legal costs of the counterclaims and injunctive relief proceedings. However, we cannot determine from the record on appeal whether the legal fees awarded against St. Paul duplicate the legal fees paid by CCC since the settlement agreement has not been included in the record on appeal. Furthermore, we cannot determine from the trial court's findings the extent to which its award against St. Paul duplicates legal fees CCC has already paid. As we are remanding the case to correct the trial court's erroneous application of the statute of limitations as well as its disallowance of the injunctive relief fees, we also remand so that the trial court may enter new findings on the issue of Duke's possible double recovery. To the extent CCC's settlement payment covered the prosecution of Duke's counterclaims, St. Paul was not entitled to any setoff since we have held St. Paul is not liable for the legal fees incurred in prosecuting Duke's counterclaims. Similarly, St. Paul is not entitled to a credit to the extent the settlement monies cover legal fees which Duke cannot recover from St. Paul as a result of the statute of limitations. Accordingly, the trial court's judgment as amended is vacated and remanded for further proceedings consistent with this opinion.

Vacated and remanded.

Judges ARNOLD and LEWIS concur.