WILLIAM T. USSERY and wife, CAROLYN B. USSERY, Plaintiffs
v.
BRANCH BANKING AND TRUST COMPANY, Defendant

No. COA12-940

Filed 21 May 2013

1. **Statutes of Limitation and Repose—claims arising from business purchase—outside the longest limitations period**

    Plaintiffs' claims arising from representations allegedly made by a bank during a business purchase were barred by the statute of limitations where the claims were filed six and one half years after they accrued, which was after the longest statute of limitations (4 years for unfair trade practices).

---

**2. Estoppel—equitable—representations during business purchase**

The trial court erred by granting summary judgment for defendant in an action arising from representations allegedly made by defendant during the financing of a business purchase where the statute of limitations had run, but plaintiffs' allegations raised a permissible inference of equitable estoppel.

**3. Loans—enforcement of note—interest and attorney fees— equitable estoppel**

The trial court erroneously allowed summary judgment for defendant as to the enforceability of a promissory note, the amount of interest accrued on the note, and attorney fees where plaintiffs' claims were sufficient to allow the jury to determine whether equitable estoppel barred operation of the statute of limitations.

DILLON, Judge, concurring in part and dissenting in part.

Appeal by Plaintiffs from Order entered 16 April 2012 by Judge W. David Lee in Richmond County Superior Court. Heard in the Court of Appeals 14 February 2013.

*Anderson, Johnson, Lawrence & Butler, L.L.P., by Steven C. Lawrence and Stacey E. Tally, for Plaintiffs.*

*Bell, Davis & Pitt, P.A., by Kevin G. Williams and Michael D. Phillips, for Defendant.*

STEPHENS, Judge.

*Factual Background and Procedural History*

This appeal arises from communications involving Branch Banking and Trust Company ("Defendant" or "BB&T"), Mr. William T. Ussery ("Plaintiff"), and Mr. D. Wayne Barker ("Barker") surrounding events occurring between November of 1999 and January of 2008. Before that time, the owners of a chair manufacturing business located in Rockingham, North Carolina, had approached Barker and Plaintiff to discuss the possibility of selling their struggling company, CAFCO. Barker had spent a number of years managing CAFCO, which manufactured chairs, but lacked Plaintiff's individual financial ability to start a business.

By November of 1999, Plaintiff and Barker had purchased CAFCO and its manufacturing building ("the original manufacturing building").

Their new company was known as "Chair Specialties" and was intended to manufacture specialty furniture. Plaintiff maintained a 60% ownership interest in the company and Barker held a 40% interest. Barker was responsible for the company's day-to-day operations, and the parties entered into their relationship with the understanding that Barker would eventually seek to purchase Plaintiff's interest in Chair Specialties with money obtained through a $450,000 government-backed small business loan ("the government-backed loan").

In order to purchase equipment to operate their business, Plaintiff and Barker also took out a $100,000 loan from BB&T. Around that same time, Plaintiff purchased a second building ("the Cheraw Road building") for $150,000. The Cheraw Road building was meant to house the Chair Specialties manufacturing operations process. Plaintiff intended to develop the original manufacturing building into a residential condominium complex. He and Barker would then use the Cheraw Road building as collateral for the government-backed loan. However, because the Cheraw Road building suffered from environmental limitations, it could not be used for manufacturing purposes until the parties had completed lead removal and abatement.

During the process of purchasing CAFCO and starting Chair Specialties, Plaintiff and Barker communicated with an employee of BB&T, Mr. Wiley Mabe ("Mabe"), concerning their plan to secure the government-backed loan. Once lead removal and abatement had been accomplished, they approached Mabe about obtaining that loan. Plaintiff alleges that Mabe "assured" them that Chair Specialties would qualify for the loan. In order to cover their expenses in the meantime, however, Plaintiff and Chair Specialties took out two more loans from BB&T over the next two years. In addition to the $100,000 note mentioned above, Chair Specialties took out a $50,000 loan in February of 2000, and Plaintiff took out a $125,000 loan in February of 2001. Plaintiff asserts that these funds were acquired in reliance on Mabe's "repeated assurances" that they would be approved for the government-backed loan.

In January of 2002, Mabe informed Plaintiff and Barker that, to his surprise, they had not qualified for the government-backed loan. After further research, Plaintiff and Barker learned that, in fact, Mabe had not submitted the loan package on time because "he did not believe that [they] would qualify." As Plaintiff and Barker had accumulated additional debt in the past two years, Plaintiff alleges they were unable to obtain any money from another source. He further alleges that, as a result, they were forced to close Chair Specialties. Three months later, in an attempt to mitigate their losses, Barker and Plaintiff applied for and received a

$425,000 loan from BB&T. The proceeds from that loan were used to pay off their three other loans, with an additional $99,187.75 going to Plaintiff.

Due in part to the terms of the final, $425,000 loan from BB&T, Barker was unable to sustain his payments. Accordingly, he brought a civil action against BB&T in May of 2003 for breach of fiduciary duty, negligence, and breach of contract. Plaintiff did not join that action and now alleges that he was dissuaded from doing so by representatives of BB&T, who allegedly assured him that "everything would be worked out in the Barker litigation" and requested that he "hold off on instituting any action[] to allow resolution of the Barker matter [and his own claims against BB&T]." In Plaintiff's answers to Defendant's first set of interrogatories, he stated that BB&T

> gave assurances . . . that [it] would resolve the matter and the Note would be canceled upon resolution of the Barker/BB&T suit. [Plaintiff] delayed filing any action against BB&T upon the assurances that the loan would be forgiven and he would be reimbursed any expenses incurred related to BB&T's failure to obtain the [government-backed loan].

Importantly, the action between Barker and BB&T was settled on 20 April 2006 — after the statutes of limitation had already expired as to Plaintiff's claims. Plaintiff consulted counsel regarding those claims that summer.[1]

On 17 October 2006, Plaintiff sent a letter to BB&T demanding both cancellation of the $425,000 loan and compensatory damages resulting from BB&T's failure to obtain the government-backed loan. After talking with counsel for BB&T, however, Plaintiff agreed to delay litigation further so that Defendant could perform an environmental inspection of the Cheraw Road building. As consideration for delaying his action, BB&T held the $425,000 note in abeyance pending completion of its inspection. Plaintiff alleges that, pursuant to that agreement, BB&T then informed him that he could "ignore the computer generated delinquency notices," which had begun to accumulate in response to his failure to make payments. On 14 August 2007, after BB&T had completed its environmental testing, Plaintiff wrote to BB&T to express his concern that "the only way for [him] to correct this situation and to be compensated

---

1. It is not clear from the record whether that was the first time Plaintiff had consulted counsel regarding his claims against BB&T. Defendant's brief indicates, however, that it was.

for his financial losses [was] through litigation." On 14 January 2008, Plaintiff received a letter from BB&T officially rejecting his 17 October 2006 demand for cancellation and proposing an alternate resolution.

On 25 June 2008, approximately six years and five months after he first learned that the government-backed loan had been denied, Plaintiff brought this action.[2] Based on his communications with BB&T, Plaintiff alleged the following independent claims: (1) negligence, (2) negligent misrepresentation, (3) breach of contract, (4) unfair and deceptive trade practices, (5) breach of fiduciary relationship, (6) breach of duty of good faith dealing, and (7) fraud. As a consequence, BB&T filed a compulsory counterclaim to collect the outstanding money, including interest, owed by Plaintiff via the $425,000 loan. BB&T noted therein its intention to collect attorneys' fees.

On 15 December 2011, BB&T moved for summary judgment on grounds that Plaintiff's action was barred by the relevant statutes of limitation. The next year, on 16 April 2012, the trial court granted BB&T's motion for summary judgment, dismissed Plaintiff's complaint with prejudice, and entered judgment in favor of BB&T. Plaintiff appeals that judgment.

## Standard of Review

"Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citation and quotation marks omitted). On a motion for summary judgment, the evidence presented must be viewed in a light most favorable to the non-moving party. *Duke Energy Corp. v. Malcolm*, 178 N.C. App. 62, 64–65, 630 S.E.2d 693, 695 (2006). "Summary judgment is a drastic remedy which should be approached with caution. It should be awarded only where the truth is quite clear." *Bradshaw v. McElroy*, 62 N.C. App. 515, 518, 302 S.E.2d 908, 911 (1983) (citations and quotation marks omitted).

## Discussion

### I. Statutes of Limitation

**[1]** Plaintiff's claims against BB&T accrued, at the latest, in January of 2002 when he learned about Mabe's alleged misrepresentation concerning

---

2. Though both Mr. Ussery and his wife are listed as "Plaintiffs," the record reflects that Mr. Ussery — who is frequently referred to in an exclusive manner as "Plaintiff" in the documents presented to this Court — was the primary, if not sole, actor.

the government-backed loan. *See, e.g., Bruce v. N.C.N.B.*, 62 N.C. App. 724, 727, 303 S.E.2d 561, 563 (1983) ("[T]he cause of action [in a case of breach of fiduciary duty] accrued at the date of the alleged breach or, at the latest, on the date it was discovered."). Plaintiff filed his complaint on 25 June 2008. As it had been at least six years and five months since Plaintiff's asserted claims accrued, those causes of action were barred by their respective statutes of limitation. As noted in Defendant's brief, the following of Plaintiff's claims are subject to a three-year statute of limitations: (1) negligence under N.C. Gen. Stat. § 1-52(5), (2) negligent misrepresentation under section 1-52(5), (3) breach of contract under section 1-52(1), (4) breach of fiduciary relationship under section 1-52(1), (5) breach of duty of good faith and fair dealing under section 1-52(1), and (6) fraud under section 1-52(9). In addition, Plaintiff's claim of unfair and deceptive trade practices is subject to a four-year statute of limitations under N.C. Gen. Stat. § 75-16.2. Because Plaintiff did not institute proceedings based on his alleged causes of action within the time allotted, they are time-barred.

## II. Equitable Estoppel

[2] Despite this, Plaintiff contends that Defendant should be equitably estopped from asserting the statutes of limitation as a defense because he relied on the alleged assurances of BB&T. We agree.

> North Carolina courts have recognized and applied the principle that a defendant may properly rely upon a statute of limitations as a defensive shield against "stale" claims, but may be equitably estopped from using a statute of limitations as a sword, so as to unjustly benefit from his own conduct which induced a plaintiff to delay filing suit.

*Friedland v. Gales*, 131 N.C. App. 802, 806, 509 S.E.2d 793, 796 (1998). "Equitable estoppel arises when a party has been induced by another's acts to believe that certain facts exist, and that party rightfully relies and acts upon that belief to his [or her] detriment." *Jordan v. Crew*, 125 N.C. App. 712, 720, 482 S.E.2d 735, 739 (1997) (citation and quotation marks omitted); *see also Bryant v. Adams*, 116 N.C. App. 448, 459–60, 448 S.E.2d 832, 838 (1994) ("A party may be estopped to plead and rely on a statute of limitations defense when delay has been induced by acts, representations, or conduct which would amount to a breach of good faith.") (citation omitted), *disc. review denied*, 339 N.C. 736, 454 S.E.2d 647 (1995). "In order for equitable estoppel to bar application of the statute of limitations, a plaintiff must have been induced to delay filing of

the action by the misrepresentations of the defendant." *Jordan*, 125 N.C. App. at 720, 482 S.E.2d at 739; *see also McNeely v. Walters*, 211 N.C. 112, 113, 189 S.E. 114, 115 (1937) (comparing the doctrine of equitable estoppel to "the golden rule" ¬¬— i.e., that "one should do unto others as, in equity and good conscience, he would have them do unto him, if their positions were reversed" — and citing to the maxim of "fair play").

On appeal, Plaintiff asserts that "when a party's actions or statements convince another not to institute legal action — particularly where promises to remedy the dispute are made — . . . , [equitable estoppel] will not permit the statute of limitations [to bar a claim] when such assurances are broken." In support of that point, Plaintiff cites three cases: *Duke Univ. v. Stainback*, 320 N.C. 337, 357 S.E.2d 690 (1987); *Cleveland Constr., Inc. v. Ellis-Don Constr., Inc.*, 210 N.C. App. 522, 709 S.E.2d 512 (2011); and *Miller v. Talton*, 112 N.C. App. 484, 435 S.E.2d 793 (1993). Though we disagree with Plaintiff's articulation of the rule, we find these cases instructive and agree that the doctrine is applicable here.

Our Supreme Court has listed the elements of equitable estoppel as follows:

> [A]s related to the party estopped . . . : (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) intention or expectation that such conduct shall be acted upon by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; (3) knowledge, actual or constructive, of the real facts.

*In re Will of Covington*, 252 N.C. 546, 549, 114 S.E.2d 257, 260 (1960).

> As related to the party claiming estoppel, [the elements] are: (1) lack of knowledge and [lack of] the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially.

*Id.* (citations omitted); *see also Parker v. Thompson-Arthur Paving Co.*, 100 N.C. App. 367, 370, 396 S.E.2d 626, 628–29 (1990) (listing the elements of equitable estoppel). Importantly, the first element — conduct

amounting to a false representation or concealment of material facts —
has alternatively been articulated as "[c]onduct . . . at least, which is rea-
sonably calculated to convey the impression that the facts are otherwise
than, and inconsistent with, those which the party afterwards attempts to
assert[.]" *Hawkins v. M & J Finance Corp.*, 238 N.C. 174, 177, 77 S.E.2d
669, 672 (1953). Further, "[a] party may be estopped to deny representa-
tions made when he had no knowledge of their falsity, or which he made
without any intent to deceive the party now setting up the estoppel. The
fraud consists in the inconsistent position subsequently taken, rather
than in the original conduct." *Hamilton v. Hamilton*, 296 N.C. 574, 576,
251 S.E.2d 441, 443 (1979) (citation, quotation marks, ellipsis, and brack-
ets omitted). Under this alternative expression of equitable estoppel, "[i]
t is the subsequent inconsistent position, and not the original conduct
that operates to the injury of the other party." *Id.* at 576–77, 251 S.E.2d at
443 (citation omitted). Primarily, the doctrine turns on a consideration
of "the balances of equity," which is dependent on the facts of each case.
*Miller*, 112 N.C. App. at 488, 435 S.E.2d at 797 (citation omitted). *"If the
evidence in a particular case raises a permissible inference that the
elements of equitable estoppel are present, but other inferences may
be drawn from contrary evidence, estoppel is a question of fact for the
jury." Id.* (citations omitted; emphasis added).

In *Stainback*, our Supreme Court addressed the issue of payment
of certain hospital bills owed by the defendant-father to Duke Hospital.
*Stainback*, 320 N.C. at 338, 357 S.E.2d at 691. Before the statute had
run and after receiving a bill from Duke, the father's attorney informed
the hospital that he was in the process of suing the father's insurer for
payment of the medical bill and "would keep Duke informed of the
situation." *Id.* at 339, 357 S.E.2d at 691. The father maintained contact
with Duke throughout the litigation and, based on the father's represen-
tations, Duke did not join the suit against the insurer. *Id.* at 339, 357
S.E.2d at 692. When Duke brought suit for payment of the bill, the father
refused to pay and asserted the statute of limitations as a defense. *Id.* at
340, 357 S.E.2d at 692. Under those circumstances, our Supreme Court
held that the father was equitably estopped from asserting the statute of
limitations as a defense because his "actions and statements . . . lulled
Duke into a false sense of security. [He] breached the golden rule and
fair play, [which justifies] the entry of equity to prevent injustice." *Id.* at
341, 357 S.E.2d at 693.

In *Cleveland Construction*, the defendant general contractor noti-
fied its subcontractor, the plaintiff, that it intended to submit a general-
ized claim for compensation to the State. *Cleveland Constr., Inc.*, 210

N.C. App. at 525, 709 S.E.2d at 517. In order to present all of the claims available, the general contractor solicited all of the plaintiff's claims to be used in its own, aggregated complaint. *Id.* A few months later, the general contractor submitted the aggregated claims and notified the sub-contractor of its submission. *Id.* at 533, 709 S.E.2d at 521. The general contractor also sent a letter to the subcontractor discouraging it from fil-ing suit against the general contractor so that both parties could present a "unified front" against the State. *Id.* The subcontractor relied on that letter and delayed suit against the general contractor until after the stat-ute of limitations had run. *Id.* Accordingly, we held that the general con-tractor was barred from asserting the statute of limitations as a defense, citing the general contractor's "affirmative representations that [(1)] it was pursuing [the subcontractor's] claims against the State and [(2)] ini-tiating a lawsuit would jeopardize 'the success' of recovery[.]" *Id.* Given those representations, we determined that the general contractor had lulled the subcontractor into a false sense of security and induced the delayed filing. *Id.* (noting that the balance of the equities disfavored the general contractor, which had already been paid on the subcontractor's claims against the State).

In *Miller*, the plaintiff property owners brought suit against the defendant neighbors for water that the defendants had allegedly redi-rected onto the plaintiffs' property. *Miller*, 112 N.C. App. at 485, 435 S.E.2d at 795. The defendants asserted the statute of limitations as a defense, and we denied that protection. *Id.* at 486, 435 S.E.2d at 796. Relying on the doctrine of equitable estoppel, we noted that the defen-dants had "repeatedly promised to remedy the surface water drainage problems, [the] plaintiffs believed that [the] defendants would keep their word and fix the problems, and[,] in reliance on [the] defendants' promises, [the] plaintiffs delayed instituting legal action." *Id.* at 489, 435 S.E.2d at 797.

For four reasons, Defendant argues that these cases are not appli-cable and Plaintiff should not be allowed to proceed to trial under a theory of equitable estoppel. First, BB&T asserts that it did not make a false representation of a material fact when it informed Plaintiff that "everything would be worked out in the Barker litigation." In support of that argument, Defendant assets that, when applying the elements of equitable estoppel, "a promise of future fulfillment does not constitute a misrepresentation of material fact unless such promise is made with no intent to comply." We disagree.

Fraud is generally found when, *inter alia*, there is (1) a false rep-resentation or concealment of a material fact, (2) which is reasonably

calculated to deceive, and (3) made with the intent to deceive. *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 569, 374 S.E.2d 385, 391 (1988) (citation omitted). Unlike fraud, equitable estoppel exists when there is simply conduct that *amounts* to a false representation of a material fact. It does not require that the defendant-party intend to misrepresent such a fact. *Hamilton*, 296 N.C. at 576, 251 S.E.2d at 443 ("[N]either bad faith, fraud nor intent to deceive is necessary before the doctrine of equitable estoppel can be applied.") (citation omitted). Accordingly, to the extent that Defendant's representations during the Barker litigation were neither "promises" nor direct attempts at deception, they do not negate the applicability of the equitable estoppel doctrine. Rather, as this Court has frequently noted, and as Defendant points out in its brief, the gravamen of equitable estoppel is the subsequent inconsistent position taken by the defendant party. *See Cleveland Constr., Inc.*, 210 N.C. App. at __, 709 S.E.2d at 521 (where defendant general contractor sent a letter to plaintiff subcontractor discouraging it from filing suit so the parties could present a "unified front," but subsequently took the inconsistent position that the plaintiff's suit was barred by the statute of limitations).

Here, Plaintiff alleges that during the pendency of the Barker lawsuit — that crucial period of time just before the statutes of limitation ran on his claims — BB&T (1) informed him that "everything would be worked out in the Barker litigation"; (2) told him to "hold off on instituting any action[] to allow resolution of the Barker matter [and his own claims against BB&T]"; and (3) informed him that "the Note would be canceled upon resolution of the Barker [suit] . . . . [,] the loan would be forgiven[,] and [Plaintiff] would be reimbursed any expenses incurred related to BB&T's failure to obtain the [government-backed loan]." Plaintiff also alleges and provides evidence that, by the end of the Barker litigation and after the statute of limitations had run, BB&T failed to follow through on these assurances. Though BB&T later stated that it was "willing to work with [Plaintiff]" despite the fact that Plaintiff's claims were "clearly time-barred" and offered to apply the net proceeds from the sale of the Cheraw Road building to the debt already owed by Plaintiff, this offer does not comport with the "assurances" Plaintiff alleges he received.

In addition, we note that the alleged assurances and subsequent inconsistent position taken in this case are, together, significantly more substantial than those in *Stainback*. As noted above, our Supreme Court made clear that equitable estoppel operated to bar application of the statute of limitations in that case when the defendant merely stated that he would "keep Duke informed of the situation" in his pending lawsuit

and was aware of Duke's continuing interest in receiving payment for its medical services. *Stainback*, 320 N.C. at 339–40, 357 S.E.2d at 691 92. Despite the fact that the defendant made no direct promise regarding what would occur after his lawsuit with the insurance carrier ended, the Supreme Court sustained the trial court's finding that "[the] *representations and conduct of* [the defendant]" justifiably induced Duke to refrain from bringing suit and, thus, held that there was sufficient evidence to estop him from pleading the statute of limitations as a defense. *See id.* at 340–41, 357 S.E.2d at 692–93. Based on *Stainback*, we conclude that the forecast of evidence in this case, considering the evidence in a light most favorable to Plaintiff, as we must, *Best v. Duke Univ.*, 337 N.C. 742, 749, 448 S.E.2d 506, 510 (1994) ("The trial court must examine the evidence in a light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that may be drawn therefrom."), is sufficient to raise an inference that BB&T's actions, when taken together, lulled Plaintiff into a false sense of security, induced him to refrain from filing suit within the required limitations periods, and, as such, constituted conduct reasonably calculated to convey the impression that the facts were otherwise than, and inconsistent with, what BB&T later attempted to assert.

Second, BB&T argues that it did not take a subsequent inconsistent position because it "never disavowed [its alleged assurance that 'everything would be worked out'] or commenced action against Plaintiffs to collect on the $425,000 note until it had no choice but to do so as a compulsory counterclaim." We are unpersuaded.

Defendant's failure to either disavow its alleged assurances or seek payment of the note owed by Plaintiff, while perhaps admirable, does not speak to the question of whether it took a subsequent inconsistent position. A party takes a subsequent inconsistent position when it fails to act in conformity with its prior assurances — not when it merely fails to deny that those assurances were made. *See, e.g., Stainback*, 320 N.C. at 338–42, 357 S.E.2d at 691–93 (holding that equitable estoppel barred operation of the statute of limitations when the defendant's actions lulled the plaintiff into a false sense of security — despite the defendant's failure to later disavow those assurances); *Meacham v. Montgomery Cnty. Bd. of Educ.*, 59 N.C. App. 381, 386, 297 S.E.2d 192, 196 (1982) ("It is undisputed that both [the] plaintiff and [the] defendant acted in good faith, yet this fact alone does not bar [the] plaintiff's claim that [the] defendant be estopped. It is sufficient that [the] defendant's subsequent inconsistent position operated to injure the plaintiff.").

Third, BB&T argues that Plaintiff failed to exercise reasonable diligence and care to protect his legal rights and, thus, is barred from circumventing the statute of limitations on a theory of equitable estoppel, citing the maxim that "he who claims the benefit of an equitable estoppel on the ground that he has been misled by the representations of another must not have been misled through his own want of reasonable care and circumspection." *Hawkins*, 238 N.C. at 179, 77 S.E.2d at 673. In support of this argument, Defendant notes that Plaintiff commenced this action (1) more than six years after learning that he did not qualify for the government-backed loan, (2) more than five years after he learned that Barker had brought suit against BB&T, (3) more than two years after the *Barker* action was settled, (4) two years after he first consulted legal counsel, and (5) more than a year after he demanded cancellation of the note. Accordingly, Defendant alleges, Plaintiff refrained from bringing suit despite having the advantage of trial counsel and despite his status as "an intelligent businessman and real estate developer who served on the board of a bank." We are, again, unpersuaded.

It appears from the record that Plaintiff first consulted legal counsel after the statute of limitations had already run on his claims. Thus, the fact that he later had access to a lawyer does not address his awareness of the legal implications of his failure to bring suit during that crucial time before the various statutes had run. Further, while it is true that Plaintiff is a competent and capable businessman, this does not preclude the operation of equitable estoppel.

As noted in Plaintiff's brief, equitable estoppel was employed by our Supreme Court in *Stainback* to allow plaintiff's suit to proceed to trial despite the fact that the statute of limitations had run. *Stainback*, 320 N.C. at 341, 357 S.E.2d at 693. The plaintiff in that case was Duke Hospital, one of the most highly rated hospitals at one of the most highly regarded universities in the nation, which has a plethora of attorneys on hand to respond to its legal disputes. *See id.* Here, while assuredly a competent businessman, Plaintiff had significantly fewer resources at his command than Duke Hospital. *See also Cleveland Constr., Inc.*, 210 N.C. App. at 524, 709 S.E.2d at 516 (where the plaintiff was a subcontractor).

While equitable estoppel does not protect an individual who simply sleeps on her or his rights, the doctrine can be and has been employed to protect parties of all levels of sophistication when those parties have relied on a false representation of material fact to their detriment and lack knowledge or the means of attaining knowledge of the real facts in question. *Parker*, 100 N.C. App. at 370, 396 S.E.2d at 628–29. Importantly,

when the real fact in question depends on the other party's willingness to cooperate at a later point, as it does here and as it did in *Stainback*, the party asserting equitable estoppel cannot have the means to know that fact at the time of the assurance. In such a circumstance, we look to whether the other party took a subsequent inconsistent position. When that has occurred, as Plaintiff properly alleges that it did here, then equitable estoppel is applicable.

Lastly, Defendant asserts that *Miller* is not applicable in this case because, unlike the plaintiffs in *Miller*, who were individual landowners not represented by legal counsel, the plaintiff in this case is "an admittedly sophisticated real estate developer" and "the 'balances of equity' do not similarly favor [him]." For the reasons discussed above, we disagree. *See, e.g., Stainback*, 320 N.C. at 341, 357 S.E.2d at 693. Accordingly, we hold that the events alleged by Plaintiff raise a permissible inference that the elements of equitable estoppel are present, and we reverse the trial court's grant of Defendant's motion for summary judgment so that the jury may address this question at trial.

### III. Attorneys' Fees

[3] Next, Plaintiff asserts that the trial court erred in granting Defendant's motion for summary judgment on BB&T's counterclaim for payment on the $425,000 loan, arguing that there is an issue of fact concerning the enforceability of the promissory note, the interest accrued on that note, and the right to recover attorneys' fees.

Because we have determined that Plaintiff's claims are sufficient to allow the jury to determine whether equitable estoppel barred operation of the statute of limitations, we hold that the trial court's grant of summary judgment as to the enforceability of the promissory note, the amount of interest accrued on the promissory note, and Defendant's right to recover attorneys' fees was in error. Therefore, we reverse the trial court's grant of Defendant's motion for summary judgment on that issue and remand for further proceedings at trial.

REVERSED AND REMANDED.

Judge STROUD concurs.

Judge DILLON concurs in part and dissents in part by separate opinion.

**USSERY v. BRANCH BANKING & TRUST CO.**

[227 N.C. App. 434 (2013)]

DILLON, Judge, concurring in part and dissenting in part.

I concur with the majority in its result that there is a genuine issue of material fact on Defendant's counterclaim as to the amount of accrued interest due under the promissory note. However, because I believe that there is no genuine issue of material fact as to Plaintiff's claims[1] or to the remainder of Defendant's counterclaims, I respectfully dissent.

### I: Statutes of Limitation

I agree with the majority's holding that "[b]ecause Plaintiff did not institute proceedings based on his alleged causes of action within the time allotted, they are time-barred."

### II: Equitable Estoppel

Plaintiff alleges in his complaint that Defendant made certain "assurances" inducing Plaintiff not to file this action before the statute of limitations had run. The majority holds these alleged "assurances" are sufficient to create a genuine issue of material fact as to whether Defendant is equitably estopped from asserting the statute of limitations as an affirmative defense. The majority has grouped these "assurances" allegedly made by Defendant into three categories:

1.  Defendant assured Plaintiff that "everything would be worked out in the Barker litigation";

2.  Defendant requested Plaintiff "hold off on instituting an action [] to allow resolution of the Barker matter"; and

3.  Defendant assured Plaintiff that "the Note would be canceled upon resolution of the Barker [suit][,] . . . the loan would be forgiven[,] and [Plaintiff] would be reimbursed any expenses incurred related to [Defendant's] failure to obtain the [government loan]."

I have thoroughly examined the record on appeal, and I do not believe the evidence before the trial shows that there is a genuine issue of material fact as to Plaintiff's claim.

Regarding the first two "assurances" cited above, there is nothing in them from which a jury could infer that Defendant promised to settle

---

1. As pointed out by the majority, though there are two plaintiffs, the record consistently refers to Mr. Ussery as "Plaintiff," as he was the primary, if not sole, actor.

the claim in any particular way. The statements are nothing more than mere "promises" that Defendant would work to resolve Plaintiff's claims in the future. We have consistently held that a mere promise to negotiate a resolution in the future, as opposed to an assurance that a claim would be resolved in a definitive way, is not the type of promise which would equitably estop a defendant from asserting a statute of limitations defense. *See Duke v. St. Paul*, 95 N.C. App. 663, 384 S.E.2d 36 (1989); *Teague v. Randolph*, 129 N.C. App. 766, 501 S.E.2d 382 (1998); *Blizzard v. Smith*, 77 N.C. App. 594, 335 S.E.2d 762 (1985), *cert. denied*, 315 N.C. 389, 339 S.E.2d 410 (1986).

In *Duke v. St. Paul*, we stated that "[m]ere negotiation with a possible settlement unsuccessfully accomplished is not that type of conduct designed to lull the claimant into a false sense of security so as to constitute an estoppel by conduct thus precluding an assertion of . . . [limitations] by the insured." *Id.* at 673, 384 S.E.2d at 42.

In *Blizzard*, we held that the plaintiff "fail[ed] to show the essential elements of equitable estoppel" based on the following communication from defendant's counsel to plaintiff's counsel: "Please do not institute any lawsuit until we have had a chance to perhaps work this matter out." *Id.* at 595-596, 335 S.E.2d at 763.

In *Teague*, we held that the elements of equitable estoppel were not present based on the following facts: A representative for the defendant's liability insurer "indicated to plaintiffs' counsel his willingness to discuss settlement or, failing that, arbitration as a possible means of resolving the matter[.]" *Id.* at 772, 501 S.E.2d at 376. Additionally, the representative "proposed a time and date to meet with [the plaintiffs'] counsel [to] discuss settlement" but later "cancelled further negotiations . . . citing his belief that [the plaintiffs'] claim was time barred." *Id.* at 772, 501 S.E.2d at 386-387.

The majority relies on *Duke Univ. v. Stainback*, 320 N.C. 337, 357 S.E.2d 690 (1987), *Cleveland Constr., Inc. v. Ellis-Don Constr.*, 210 N.C. App. 522, 709 S.E.2d 512 (2011), and *Miller v. Talton*, 112 N.C. App. 484, 435 S.E.2d 793 (1993), to support its holding that there is a genuine issue of material fact as to plaintiff's equitable estoppel claim in this case. I believe each of the foregoing cases are readily distinguishable from this case because each involves statements or conduct which led a plaintiff to believe that the defendant would resolve a claim in a definitive way. In *Stainback* and in *Cleveland Construction*, the defendant's conduct led the plaintiff to believe that the defendant would pay the plaintiff's claim if and when the defendant received a recovery from a certain third

party. However, in both cases, the defendant subsequently received money from the third party, but refused to pay the plaintiff. In *Miller*, the defendant promised his neighbor to fix a water-flow problem which had damaged his neighbor's land, again an "assurance" to resolve a dispute in a particular way. Relying on this promise, the neighbor held off on filing an action. However, after the statute of limitations had run, the defendant refused to fix the problem.

The third "assurance" cited by the majority is an oral statement allegedly made by an officer of the Defendant that Defendant would cancel the promissory note and reimburse Plaintiff his expenses he had incurred. However, I believe this alleged oral assurance by Defendant's officer is inadmissible and incompetent under the parole evidence rule, and therefore cannot be relied upon to create a material factual issue to withstand a summary judgment motion. Here, after Defendant's alleged assured Plaintiff that the note would be forgiven, the record shows that on six occasions over a 44-month period, from April 2003 to November 2006, Plaintiff executed separate "Note Modification Agreement[s]." In each of these six written agreements, Plaintiff acknowledged owing the debt and promised to repay the debt.

The applicability of the parole evidence rule in the context of a promissory note has been dealt with extensively by our Supreme Court, most notably in the case *Borden v. Brower*, 284 N.C. 54, 199 S.E.2d 414 (1973). After stating the basic principles of the parole evidence rule generally, the Court in *Borden* stated the following:

> Promissory notes are not generally subject to the parole evidence rule to the same extent as other contracts . . . .
> [I]t is rather common for a promissory note to be intended as only a partial integration of the agreement in pursuance of which it was given, and parole evidence as between the original parties may well be admissible *so far as it is not inconsistent with the express terms of the note.*

*Id.* at 61, 199 S.E.2d at 419-20 (1973) (emphasis added); *see also Bank v. Gillespie*, 291 N.C. 303, 308, 230 S.E.2d 375, 378-79 (1976).

The *Borden* Court provided situations where parole evidence may be admissible to show an agreement at variance to the terms of the written promissory note:

> "[T]his Court has permitted variance of [the] expressed terms [of a promissory note] by showing that it was to be enforced only on the happening of certain conditions, or

only to the extent necessary to accomplish a certain purpose, or that it was payable only out of a certain fund, or that it was given as evidence of an advancement, or that it might be discharged by a method of payment or performance different from that stated in the writing."

*Id.* at 63, 199 S.E.2d at 421. The Court cited eleven "[o]ther promissory note cases involving the North Carolina method of payment and discharge exception to the parole evidence rule" as follows:

"*Carroll v. Brown,* 228 N.C. 636, 46 S.E.2d 715 (1948) (note to be paid out of profits of a partnership in which maker and payee were engaged); *Ripple v. Stevenson,* 223 N.C. 284, 25 S.E.2d 836 (1943) (note to be paid out of rents and profits from an office building); *Insurance Co. v. Guin,* 215 N.C. 92, 1 S.E.2d 123 (1939) (note to be paid out of commissions); *Bank v. Rosenstein,* 207 N.C. 529, 177 S.E. 643 (1935) (co-maker's liability on a note limited to the value of land covered by a deed of trust); *Galloway v. Thrash,* 207 N.C. 165, 176 S.E. 303 (1934) (note to be paid by crediting it against payee's anticipated share of maker's estate); *Trust Co. v. Wilder,* 206 N.C. 124, 172 S.E. 884 (1934) (note to be paid out of proceeds of land when land was sold); . . .; *Kerchner v. McRae,* 80 N.C. 219 (1877) (bond to be credited with the proceeds from sale of cotton)."

*Id.* at 62-63, 199 S.E.2d at 420. In *Borden* and in the eleven cases cited in that decision, a debtor was allowed to introduce parole evidence to show an oral agreement regarding the *means* by which the obligation recited in the written note would be satisfied, because the parole evidence did not contradict the terms of the note. However, there is no exception to the parole evidence rule regarding evidence that a borrower simply and inexplicably does not owe the money he was loaned.

To the contrary, the Supreme Court's explained *Borden* in its prior ruling in *Vending Co. v. Turner,* 267 N.C. 576, 148 S.E.2d 531 (1966). In *Vending Co.,* our Supreme Court stated that "[t]he promise set forth in [a promissory] note could not be contradicted or destroyed by parole testimony that the makers thereof would not be called upon to pay in accordance with the terms of the note." *Id.* at 582, 148 S.E.2d at 536. In explaining *Vending Co.,* the *Borden* Court stated:

"Although that opinion does contain a general statement to the effect that a promise set forth in the note could not be contradicted or destroyed by parol testimony, the

opinion actually affirmed a judgment that embodies *the mode of payment or method of discharge exception to the parol evidence rule.*"

*Borden,* 284 N.C. at 65, 148 S.E.2d at 422 (emphasis added).

I believe *Borden* and the eleven cases cited therein are distinguishable from the case *sub judice.* In this case, the alleged oral "assurance" made prior to the written modification agreements was that Defendant was simply forgiving the $425,000 note and all interest expense payable thereunder. The "assurance" was not an oral agreement describing the *means* by which the payment of the note would be paid or the *method* by which Plaintiff's obligation would be discharged or otherwise which would fall under any of the other exceptions recited in *Borden* where parole evidence would be allowed. Rather, the alleged oral "assurance" that the promissory note would not have to be paid back under any circumstance is in *direct contradiction* to the terms of the six written agreements executed by Plaintiff. Therefore, I believe the alleged statement by Plaintiff that Defendant would simply forgive the $425,000 note and all of Plaintiff's expenses is incompetent, as it violates the parole evidence rule, and therefore, must not be considered in the determination of whether there is a genuine issue of material fact with regard to Plaintiff's claims.[2]

Even if this alleged "assurance" is not barred by the parole evidence rule, I do not believe the assurance is otherwise sufficient to create a jury question regarding equitable estoppel. Plaintiff admits in his brief and in his affidavit that was offered at the summary judgment hearing that the alleged assurance was merely *part* of an unresolved settlement negotiation. Specifically, on page 8 of his brief, Plaintiff recites the following as his version of the facts:

> "[Defendant] continued to assure [Plaintiff] after the Barker settlement was entered that their $425,000.00 Note, and their expenses related to [Defendant's] failure

---

2. In *Bank v. Gillespie,* in which the Supreme Court quotes the Borden decision extensively, the Court considered "the course of dealings" between the parties to determine whether parole evidence would be admissible. *Id.* at 310, 230 S.E.2d at 379-380. In the case *sub judice,* Plaintiff's course of dealing with regard to the note is in direct contradiction to the alleged "assurance" that he would not be held liable for the principle or interest expense under the note. Specifically, in addition to executing six note modifications where he acknowledged the debt and agreed to pay it back, an attachment to Plaintiff's own affidavit shows that Plaintiff continued to pay interest expenses on the promissory note on a number of occasions, with the last interest payment in the amount of $11,064.76 being made in April 2006.

> to procure financing for Barker and Chair Specialties, *would be worked out . . . .* Although [Defendant] failed *to propose a specific plan* and improperly refused to provide Plaintiff information regarding [Defendant's settlement with Mr. Barker, Defendant's] issuance of several Note Modification Agreements from 2003 through 2006, as additional consideration for refraining from filing suit, and its agreement on 5 July 2006 *to discuss resolution* as previously pledged, reassured Plaintiffs that [Defendant] would honor its promise.

(emphasis added.) Also, Plaintiff, in his affidavit, characterizes the assurance in the following way:

> I have previously set forth in Plaintiff's responses to Defendant's written discovery, my conversations with Charles Smith, authorized representative of BB&T, at the time of the litigation was filed by Wayne Baker against BB&T . . . and the fact that Charles Smith had advised me that the issues involving the expenses and debt involving Chair Specialties, including the $425,000.00 Note, *would be resolved.*

(emphasis added.) Since Plaintiff admitted at the summary judgment hearing and in his brief that he interpreted the alleged assurance as part of a settlement that had not yet been resolved, this assurance is essentially the same as the first two assurances, namely a promise to reach a definitive resolution in the future; and, likewise, cannot be relied upon by Plaintiff to establish a genuine issue of material fact regarding equitable estoppel.[3] *See St. Paul*, 95 N.C. App. 663, 384 S.E.2d 36; *Randolph*, 129 N.C. App. 766, 501 S.E.2d 382; *Smith*, 77 N.C. App. 594, 335 S.E.2d 762.

### III: Defendant's Counterclaims

I believe that Defendant is entitled to judgment as a matter of law on its counterclaims to recover the outstanding principal due on the

---

3. Additionally, Plaintiff failed to show why it would have been "reasonable" for him to rely on any statement by Defendant that (1) his claims against Defendant regarding the promissory note would somehow be resolved or worked out in an unspecified way without his input or participation and in the course of the legal proceeding with Mr. Barker, who was not a party to the note; or (2) that Defendant would unilaterally forgive the entire $425,000.00 debt and repay Plaintiff's incurred expenses where Defendant otherwise required Plaintiff to continue paying interest, which Defendant, in fact, continued to pay. *Adkins v. Adkins*, 82 N.C. App. 289, 291, 346 S.E.2d 220, 221 (1986) (stating that "[a]n essential element of [equitable estoppel] is reasonable reliance").

note of $425,000.00; pre-judgment interest from December 13, 2011 in the amount of $97.40 per day; and attorneys' fees in the amount of $63,750.00. However, I believe the evidence in the record creates a genuine issue of material fact as to the amount of interest owed on the promissory note. There is evidence in the record that Plaintiff would not be responsible for interest payments for at least some period following his last interest payment made in April 2006. This evidence includes a print-out generated by Defendant that $38,164.14 in interest was waived in 2007. Therefore, I would reverse the portion of the summary judgment order which awards the interest due on the promissory note and remand this cause for a jury trial on this issue only.

## IV: Conclusion

For the reasons stated above, I would vote to affirm the trial court's summary judgment order to the extent that it grants summary judgment in favor of Defendant on Plaintiff's claims and to the extent that it grants summary judgment to Defendant on its counterclaims for the principal due on the promissory note, prejudgment interest, and attorneys' fees. I would vote to reverse and remand for a trial on the issue of damages with respect to the amount of interest due on the promissory note.