Mauck v. Cherry Oil Co., Inc., 2022 NCBC 21.

STATE OF NORTH CAROLINA

LENOIR COUNTY

ARMISTEAD B. MAUCK and
LOUISE CHERRY MAUCK,

Plaintiffs,

v.

CHERRY OIL CO., INC.; JULIUS P.
"JAY" CHERRY, JR.; and ANN B.
CHERRY,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 343

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT**

THIS MATTER comes before the Court upon Defendants' Motion to Dismiss Second Amended Complaint. ("Motion to Dismiss" or "Motion," ECF No. 49.)

THE COURT, having considered the Motion, the briefs of the parties, the arguments of counsel, and all applicable matters of record, CONCLUDES that the Motion should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Walter L. Tippett, Jr. and Katarina K. Wong, for Plaintiffs Armistead B. Mauck and Louise Cherry Mauck.*

*Womble Bond Dickinson (US) LLP, by Pressly M. Millen and Samuel B. Hartzell for Defendants Cherry Oil Co., Inc.; Julius P. "Jay" Cherry, Jr.; and Ann B. Cherry.*

Davis, Judge.

## INTRODUCTION

1. As this Court has previously stated, "[t]his action, succinctly put, concerns a dispute among family members over the management and future direction

of a family business." *Mauck v. Cherry Oil Co.*, 2021 NCBC LEXIS 81, at **2 (N.C. Super. Ct. Sept. 20, 2021). In the present motion to dismiss, the Court is tasked with analyzing several legal issues relating to the rights of minority shareholders in the context of a close corporation. In so doing, the Court must also determine the extent to which Plaintiffs' claims are affected by the parties' Shareholders' Agreement, which contains a "put/call" provision that authorizes the corporation to purchase the shares of a shareholder at any time.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites pertinent facts contained in Plaintiffs' Second Amended Complaint ("SAC," ECF No. 48) and in documents attached to, referred to, or incorporated by reference in the SAC that are relevant to the Court's determination of the Motion.

3. Defendant Cherry Oil Company, Inc. ("Cherry Oil")[1] is a business that, both directly and through its affiliates—AJAL Investments, LLC ("AJAL") and C-Gas, LLC ("C-Gas")[2]—"owns and operates a substantial propane and refined fuel distribution operation serving business and residential customers and roughly 15 convenience stores, along with a portfolio of associated commercial real estate." (ECF

---

[1] Cherry Oil is a North Carolina corporation with its registered place of business in Lenoir County, North Carolina. (ECF No. 48, at ¶ 9.)

[2] AJAL and C-Gas are not named parties to this action. Nevertheless, the SAC alleges that the "Maucks['] and Cherrys['] 50-50 ownership of AJAL and C-GAS reflect their long-standing commitment and intention to sharing the benefits of Cherry Energy evenly between their families." (*Id.* at ¶ 24.)

No. 48, at ¶ 1.) Cherry Oil and its affiliates—which the parties refer to collectively as "Cherry Energy"—have been owned and managed by members of the individual parties' extended family since Cherry Oil was founded in 1928 by J.P. Cherry, Sr. (*Id.* at ¶¶ 2, 15, 34.)

4. Plaintiffs Armistead B. Mauck ("Armistead") and Louise Cherry Mauck ("Louise") (collectively, the "Maucks" or "Plaintiffs") are married and together own and control 194 (approximately 34%) of Cherry Oil's shares. (*Id.* at ¶ 8.)

5. Armistead individually owns 97 shares (17%) of Cherry Oil. (*Id.* at ¶¶ 6, 13.) J.P. Cherry, Sr. and Defendant Julius P. Cherry, Jr. ("Jay") "asked Armistead to join [Cherry Oil] in late 1995" after which Armistead "left a successful banking career to try to help save the family business." (*Id.* at ¶¶ 19–20.) Armistead has served as an officer and director of Cherry Oil since 1995 and his responsibilities have expanded to include "all aspects of Cherry Energy, ranging from short-term and long-term strategic planning, financial management, marketing, acquisitions, personnel, and operational decisions." (*Id.* at ¶¶ 6, 20.)

6. Louise individually owns 97 shares (17%) of Cherry Oil and has served as an officer of the company since August 2000. She also served as a member and officer of Cherry Oil's Board of Directors ("Board") from August 2000 until her purported removal from the Board—the validity of which Plaintiffs dispute—on 16 June 2021. (*Id.* at ¶ 7.) Since 2004, Louise has "worked as Cherry Energy's payroll and human resources manager" where she has "implemented modern employment

best practices and benefits for its staff, which initiatives would not have been properly implemented and maintained without her involvement." (*Id*. at ¶ 21.)

7. Defendants Jay and Ann B. Cherry ("Ann") (collectively, the "Cherrys" or "Defendants") are married and together own and control 390 (approximately 66%)—a majority interest—of Cherry Oil's shares.[3] (*Id*. at ¶ 12.) Jay is Louise's brother and serves both as the chairman of the Board and as president of Cherry Oil. (*Id*. at ¶¶ 10, 15.) Ann is a director, vice president, and assistant secretary of Cherry Oil. (*Id*. at ¶ 11.)

8. On 15 October 1998, the Maucks and Cherrys entered into a Shareholders' Agreement. ("Shareholders' Agreement," ECF No. 15.2.) Pertinent to this dispute, Section 11 of the Shareholders' Agreement contained a provision (the "Put/Call Provision") that states, in pertinent part, as follows:

> [T]he Corporation shall have the right to purchase (i.e., "call") from each Shareholder (or his legal representative) all, but not less than all, of his Shares for the price specified in Section 6 and upon the terms specified in Section 7. If the Corporation shall elect to purchase all such Shares, the Corporation shall provide notice to the Shareholder whose Shares are called (or his legal representative), which such [sic] notice shall fix a closing date not more than sixty (60) days after the receipt of the same.
>
> The Shareholder subject to a . . . call shall vote, and take any other necessary action, in accordance with the vote of the Shareholders owning a majority of the shares.

(*Id*. at § 11).

9. Until early 2020, Armistead and Louise maintained "a not less than equal role in the management and operation of Cherry Oil and Cherry Energy," and

---

[3] Specifically, Jay owns 348 shares (59%), while Ann owns 42 shares (7%). (ECF No. 48, at ¶¶ 10–11.)

Plaintiffs allege that "with Armistead's leadership, Cherry Oil's performance has steadily improved." (ECF No. 48, at ¶¶ 27, 40.) Plaintiffs assert that "[t]oday, Cherry Oil—and more broadly—Cherry Energy are successful" and that "Armistead's skills were necessary to . . . achieve that success." (*Id*. at ¶ 33.)

10. Plaintiffs further allege that "since Armistead joined Cherry Energy's management, Jay has voluntarily and steadily turned over his remaining, limited responsibilities to Armistead, and Ann has maintained virtually no presence at this business." (*Id*. at ¶ 23.) These circumstances—along with the success of Cherry Oil under Armistead and Louise's leadership—created the Maucks' expectation "that they would [continue to] be involved in management decisions as they have since" they joined Cherry Oil. (*Id*. at ¶¶ 38–40.)

11. Nevertheless, in or around 2007, the dispute that ultimately gave rise to this lawsuit began when Jason Cherry ("Jason")—Jay and Ann's son—joined Cherry Oil as an employee. (*Id*. at ¶ 45.) Plaintiffs allege that Jason lacks "commit[ment] to developing the skills or doing the work necessary to succeed on individual merit, rather than nepotism," pointing to critical reviews of Jason's job performance by company employees and a "family business consultant." (*Id*. at ¶¶ 46, 48; *see* ECF Nos. 48.3–5.)

12. Plaintiffs' dissatisfaction with Jason's performance at Cherry Oil derives in part from their concern over the prospect of Jason ultimately obtaining control of Cherry Oil—given "Jay's desire to retire and to complete estate planning,

part of which involves leaving Jason, despite chronic shared concerns of all parties, potentially in a controlling ownership position." (ECF No. 48, at ¶ 49.)

13. Starting in 2018, efforts were made by the Maucks and Cherrys to address Jason's "dysfunctional contributions to the business" such that a "cooperative solution" could be reached as to the "continuing operation of Cherry Energy after Jay and/or Armistead's retirement." (*Id.* at ¶¶ 50–56.) These efforts included (a) consulting Cherry Oil's general counsel; (b) each side hiring their own corporate legal counsel and a professional mediator; (c) Armistead and Louise "openly discuss[ing] their expectations"; (d) implementation and preparation of an "accountability chart"; and (e) the hiring of Maggie Cherry— Jason's wife—to "remedy the problems created by Jason[.]" (*Id.*) While these efforts "seemingly made progress," they did not lead to any final resolution. (*Id.* at ¶¶ 50, 56.)

14. After the parties' negotiations failed, Plaintiffs allege that over the last twenty-two months leading up to this lawsuit,

> Jay and Ann have acted in concert to divide the extended family, setting brother against sister as Jay and Ann seek to consolidate their control over Cherry Oil to themselves for the benefit of themselves and what they call their "next generation" to the exclusion and at the expense of Armistead and Louise and Cherry Oil.

(*Id.* at ¶ 55.) Plaintiffs contend that Jay and Ann launched a secret effort to undermine them because Plaintiffs objected to their "reckless desire to entrust Cherry [Oil] to Jason." (*Id.* at ¶ 58.) Plaintiffs allege that "Jay and Ann have abused their majority status and positions on the board and in management of Cherry Oil to

benefit themselves and their immediate families at the expense of Armistead and Louise and Cherry Oil." (*Id.* at ¶ 66.)

15. The SAC sets out various examples of acts committed by Jay and Ann that Plaintiffs contend demonstrate the Cherrys' desire to marginalize Armistead and Louise while simultaneously increasing Jason's role within the company. Plaintiffs assert that the Cherrys' conduct constituted "breach[es] of Armistead and Louise's reasonable expectations regarding management of Cherry Oil." (*Id.* at ¶¶ 59–66.)

16. For example, the SAC includes allegations that: Ann referred to Armistead as "scary," "crazy," a "bully," and a "monster" to other Cherry Oil employees; Jay and Jason "frustrated a critical employee to the point that he quit so that Jason could assume his position"; Jay and Ann made modifications to the management of Cherry Oil that are "a stark departure from how the business has been run[,]" including "counterproductive" personnel and operational changes; Jay and Ann "allow[ed] Jason to take charge of areas under Armistead's longstanding areas of responsibility" and "actively work[ed] to frustrate initiatives Armistead brought to Cherry Oil"; and Jay and Ann have used their positions of power and control to unlawfully "enable and pursue pointless investigations" of Plaintiffs. (*Id.* at ¶ 59(a)–(b), (d), and (f).)

17. Further, the SAC asserts that "Jay and Ann failed to exercise good faith, care, and diligence to make Cherry Oil's assets and opportunities produce the largest possible profit," including: allowing the loss of Cherry Oil's best propane driver; removing books and records from the company and then withholding a "key

document"; executing "significant contracts without reading them"; generating "significant customer management and retention problems"; "allowing fuel to be delivered to known high risk credit customers"; "misrepresenting Armistead's true intentions"; and "abandon[ing] . . . technology training and investments." (*Id*. at ¶ 61(a)–(g).)

18. On 9 April 2021, Plaintiffs sent a letter (the "Derivative Demand Letter") to Cherry Oil demanding that the company take appropriate action with regard to their allegations of misconduct by the Cherrys. (*Id*. at ¶ 67; *see* "Derivative Demand Letter," ECF No. 48.13.) The Derivative Demand Letter detailed much of the same alleged misconduct that is alleged in Plaintiffs' pleadings in this action and included a demand that Cherry Oil "immediately take all reasonable steps to compel the [Cherrys] to cease their unlawful conduct and obtain appropriate relief from them." (ECF No. 48.13, at p. 4.) The Derivative Demand Letter further stated: "Please respond to this demand as quickly as possible. In the event that [Cherry Oil] fails to meet the demand stated above, the Shareholders may bring litigation on [Cherry Oil's] behalf to force the Prospective Defendants to remedy the harms outlined [in this letter] through monetary damages[.]" (*Id*.)

19. Before receiving a response to the Derivative Demand Letter, Plaintiffs filed their original complaint in this action in Lenoir County Superior Court on 6 May 2021 against Defendants Cherry Oil, Jay, and Ann. (ECF No. 3.) The complaint asserted five claims for relief: (1) dissolution of Cherry Oil pursuant to N.C.G.S. § 55-14-30; (2) removal of Jay and Ann as directors under N.C.G.S. § 55-8-09; (3) breach

of fiduciary duty and constructive fraud against Jay and Ann; (4) breach of contract against Jay; and (5) a putative claim for constructive trust against Jay and Ann. No derivative claims were asserted at that time.

20. On 7 June 2021, this action was designated as a mandatory complex business case and assigned to the Honorable Gregory P. McGuire. (Design. Ord., ECF No. 1; Assign. Ord., ECF No. 2.)

21. Plaintiffs assert that "[a]fter Armistead and Louise filed the [i]nitial Complaint, Jay and Ann intensified and amplified their prior misconduct" in a number of ways, including the following: (1) Jay and Ann improperly noticed a 16 June 2021 shareholders meeting where Louise was purportedly removed from the Board (ECF No. 48, at ¶ 81); (2) Jay and Ann improperly noticed a 16 June 2021 directors meeting with the "new" Board (composed of only Jay, Ann and Armistead) to approve a "call" to purchase Plaintiffs' shares in Cherry Oil pursuant to the Shareholders' Agreement (*Id*. at ¶ 84); (3) the books and records made available to Plaintiffs prior to the 16 June 2021 directors meeting "did not include the [S]hareholder [A]greement to which Jay, Ann, and [Defendants' counsel] cited during the meetings and upon which they now rely to allege a right to purchase Armistead and Louise's shares" (*Id*. at ¶ 82); (4) Jay and Ann hired their own previously retained counsel, Womble Bond Dickinson (US) LLP ("Womble Bond"), to also serve as counsel for Cherry Oil despite Armistead and Louise's objections due to perceived conflicts of interest (*Id*. at ¶ 88); and (5) since the Board purportedly voted to purchase Armistead and Louise's shares, "Jay and Ann and Cherry Oil have done nothing to make [the

purchase] happen" pursuant to the terms of the Shareholders' Agreement (*Id*. at ¶ 85).

22. On 1 July 2021, this action was reassigned to the undersigned. (Reassign. Ord., ECF No. 11.)

23. On 29 July 2021, Plaintiffs filed a First Amended Complaint ("FAC," ECF No. 18) naming Jay, Ann, and Cherry Oil as Defendants—reiterating their prior allegations and adding derivative claims against Jay and Ann for gross negligence/willful misconduct; breach of fiduciary duty; constructive fraud; and a claim seeking the removal of Jay and Ann as directors under N.C.G.S. § 55-8-09.

24. On 20 September 2021, this Court denied Plaintiffs' Motion to Disqualify Womble Bond (ECF No. 12) as counsel for Cherry Oil, concluding that Womble Bond was permitted to simultaneously represent the interests of both Cherry Oil and the Cherrys.[4] (ECF No. 28.)

25. On 6 December 2021, this Court granted Plaintiffs leave to file the SAC (ECF No. 46), which was filed shortly thereafter. (ECF No. 48.)

26. The SAC contains the following combination of derivative and individual claims: (1) a claim for dissolution of Cherry Oil pursuant to N.C.G.S. § 55-14-30 (brought individually by Plaintiffs against Cherry Oil) (*Id*. at ¶¶ 93–103); (2) breach of fiduciary duty and constructive fraud claims (brought individually by Plaintiffs against Jay and Ann) (*Id*. at ¶¶ 104–19); (3) a breach of contract claim (brought

---

[4] Specifically, this Court found that the allegations in the FAC did not amount to "serious charges of wrongdoing" by Jay and Ann as directors of Cherry Oil that would necessitate the Cherrys and Cherry Oil being represented by separate counsel. *Mauck*, 2021 NCBC LEXIS 81, at **21.

individually by Armistead against Jay with regard to an alleged agreement by Jay to transfer 30 shares of Cherry Oil to Armistead) (*Id*. at ¶¶ 120–32); (4) a claim for constructive trust (brought individually by Plaintiffs against Jay and Ann) (*Id*. at ¶¶ 133–38); (5) a claim for "gross negligence/willful misconduct" (brought derivatively on behalf of Cherry Oil against Jay and Ann) (*Id*. at ¶¶ 139–41); (6) a breach of fiduciary duty claim (brought derivatively on behalf of Cherry Oil against Jay and Ann) (*Id*. at ¶¶ 142–45); (7) a constructive fraud claim (brought derivatively on behalf of Cherry Oil against Jay and Ann) (*Id*. at ¶¶ 146–49); (8) a claim for removal of Jay and Ann as directors of Cherry Oil pursuant to N.C.G.S. § 55-8-09 (brought derivatively on behalf of Cherry Oil) (*Id*. at ¶¶ 150–55); and (9) a breach of contract claim (brought individually by Plaintiffs against all Defendants for allegedly "fail[ing] to take reasonable and necessary steps [pursuant to the Shareholders' Agreement] to complete the call transaction while exercising dominion and control over [Plaintiffs'] shares") (*Id*. at ¶¶ 156–64).

27. On 12 January 2022, Defendants filed the present Motion to Dismiss, requesting that the Court dismiss with prejudice all of the claims asserted by Plaintiffs in the SAC pursuant to Rules 12(b)(1) and 12(b)(6). (ECF No. 49.)

28. The Court held a hearing on the Motion to Dismiss on 4 March 2022. The Motion is now ripe for resolution.

## LEGAL STANDARD

29. "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *In re A.S.M.R.*, 375 N.C. 539, 542 (2020) (cleaned up).

Rule 12(b)(1) requires the dismissal of any action "based upon a trial court's lack of jurisdiction over the subject matter of the claim." N.C.G.S. § 1A-1, Rule 12(b)(1).[5] The plaintiff bears the burden of establishing subject matter jurisdiction. *See Harper v. City of Asheville*, 160 N.C. App. 209, 217 (2003). In ruling on a motion to dismiss for lack of standing pursuant to Rule 12(b)(1), the Court "may consider matters outside the pleadings" in determining whether subject matter jurisdiction exists, *Harris v. Matthews*, 361 N.C. 265, 271 (2007), and must "view the allegations [of the complaint] as true and the supporting record in the light most favorable to the non-moving party[,]" *Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 644 (2008).

30. In contrast, in ruling on a motion to dismiss under Rule 12(b)(6), the Court may only consider the pleading and "any exhibits attached to the [pleading,] *Krawiec v. Manly*, 370 N.C. 602, 606 (2018), in order to determine whether "as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some [recognized] legal theory," *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc.*, 336 N.C. 438, 442 (1994) (quoting *Lynn v. Overlook Dev.*, 328 N.C. 689, 692 (1991)). The Court must view the allegations in the complaint "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017) (quoting *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 852 (2016)).

---

[5] The Court notes that "[a] plaintiff's standing to assert its claims may be challenged under either Rule 12(b)(1) or Rule 12(b)(6)[.]" *Raja v. Patel*, 2017 NCBC LEXIS 25, at *11 (N.C. Super. Ct. Mar. 23, 2017).

31. "It is well-established that dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up). Additionally, the Court may "reject allegations [in the complaint] that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster v. Francis*, 199 N.C. App. 572, 577 (2009); *see also Oberlin Capital, L.P v. Slavin*, 147 N.C. App. 52, 60 (2001) (stating that in deciding a Rule 12(b)(6) motion, the Court may consider documents to which the complaint specifically refers).

32. With regard to the present Motion to Dismiss, Defendants contend that Plaintiffs lack standing to assert a dissolution claim and, as such, the Court will analyze that portion of their Motion pursuant to Rule 12(b)(1). Defendants seek to dismiss the remaining claims in the SAC for failure to state a valid claim for relief. Those claims will therefore be analyzed pursuant to Rule 12(b)(6).

## ANALYSIS

### A. Dissolution Claim

33. N.C.G.S. § 55-14-30 provides, in pertinent part, as follows:

> The Superior Court may dissolve a corporation: . . . (2) [i]n a proceeding by a shareholder if it is established that . . . (ii) liquidation is reasonably necessary for the protection of the rights and interests of the complaining shareholder; . . . [or] (iv) the corporate assets are being misapplied or wasted[.]

N.C.G.S. § 55-14-30(2)(ii), (iv).

34. Plaintiffs' first cause of action seeks judicial dissolution of Cherry Oil under N.C.G.S. § 55-14-30 based on theories of both frustration of reasonable expectations and waste of corporate assets. (ECF No. 48, at ¶¶ 96, 100.)

35. With respect to claims for dissolution under § 55-14-30(2)(ii), the North Carolina Business Corporation Act ("BCA") provides an alternative to dissolution by allowing the corporation to purchase the shares of the complaining shareholder:

> In a proceeding brought by a shareholder under [N.C.]G.S. [§] 55-14-30(2)(ii) in which the court determines that dissolution would be appropriate, the Court shall not order dissolution if, after such determination, the corporation elects to purchase the shares of the complaining shareholder at their fair value, as determined in accordance with such procedures as the court may provide.

N.C.G.S. § 55-14-31(d).

36. Defendants argue that Plaintiffs lack standing to assert a dissolution claim such that dismissal of the claim is appropriate under Rule 12(b)(1). Defendants contend that any "reasonable expectations" of Plaintiffs were addressed in the Put/Call Provision of the Shareholders' Agreement, which they contend "provides [Plaintiffs] with only two remedies for their discontent: they may put their shares to the company or their shares may be called by it." (ECF No. 53, at p. 1.)

37. Plaintiffs do not deny signing the Shareholders' Agreement or argue that its terms are unconscionable. Instead, they argue that Defendants' standing argument fails because (1) a shareholders' agreement cannot circumvent the statutory process for dissolution available to shareholders in N.C.G.S. § 55-14-30; (2) the Shareholders' Agreement has been "superseded by the conduct of the parties"; (3)

the call of Plaintiffs' shares was invalid due to insufficient notice of the shareholder meeting; and (4) Cherry Oil has not yet actually purchased Plaintiffs' shares. (ECF No. 52, at pp. 4–5.) In addition, Plaintiffs assert that if their shares are to be bought by Cherry Oil, the buyout should occur pursuant to the procedure set out in N.C.G.S. § 55-14-31(d) and that the Court should oversee the process.

38. Plaintiffs' argument that a provision in a shareholders' agreement is invalid if it conflicts with the statutory provisions in the BCA regarding dissolution is incorrect. To the contrary, N.C.G.S. § 55-7-31, which governs shareholders' agreements, expressly provides that an agreement among shareholders in non-public corporations that complies with the terms of that statute is permissible "*even though it is inconsistent with one or more provisions of this Chapter*." N.C.G.S. § 55-7-31(b) (emphasis added). Further, the BCA provides that a shareholders' agreement is valid if, as here, it "governs the exercise of the corporate powers or the management of the business and affairs of the corporation or the relationship between or among the shareholders, the directors, and the corporation and is not contrary to public policy." *Id.* at (b)(8).

39. Thus, put/call provisions contained within a shareholders' agreement are legally effective. *See, e.g., Harris v. Testar, Inc.*, 243 N.C. App. 33, 40 (2015) (enforcing call provision in stockholders' agreement requiring shareholder to sell his shares to the corporation upon termination of employment); *see also* 1 ROBINSON ON NORTH CAROLINA CORPORATION LAW § 9.05[3] (2021) (explaining that "call" provisions are one of the "most frequently encountered" provisions in shareholders' agreements

of close corporations, and they "may be useful to give controlling shareholders an alternative to eliminating dissident minority shareholders" by more complicated means).

40.     Here, the shareholders of Cherry Oil—Jay, Ann, Armistead, and Louise—entered into a Shareholders' Agreement in 1998 in which they bound themselves to a procedure that serves as an alternative to bringing a judicial dissolution action. This procedure is contained in the Put/Call Provision of Section 11 of the Shareholders' Agreement, which grants Cherry Oil the right to purchase ("call")—or the shareholder the right to sell ("put")—all of the shareholder's shares at fair market value. (ECF No. 15.2, at § 11.) Although Plaintiffs would clearly prefer to pursue statutory dissolution of Cherry Oil pursuant to N.C.G.S. § 55-14-30, that option is no longer available to them.

41.     The SAC is replete with allegations that Jay and Ann have acted inconsistently with Plaintiffs' reasonable expectations regarding their continuing status with Cherry Oil. But the Put/Call Provision in Section 11 of the Shareholders' Agreement reflects a bargained-for agreement between the shareholders that a shareholder's right to receive fair market value for his or her shares is sufficient to protect the "reasonable expectations" of minority shareholders such as the Maucks. *See Harris*, 243 N.C. App. at 39–40 (holding that where a complaining shareholder's shares were "called" by the corporation pursuant to a provision in the shareholders' agreement, the complaining shareholder's "reasonable expectations" were

"adequately protected" by the buying out of his shares at the price set forth in the "call" provision).

42. Although Plaintiffs argue that the Put/Call Provision was somehow superseded by the conduct of the parties since 1998, Plaintiffs have failed to make any cogent argument as to why this is so. Indeed, the Shareholders' Agreement contains a modifications clause, which states that "[n]o change or modification of this Agreement shall be valid unless the same be in writing and signed by all the parties hereto." (ECF No. 15.2, at § 16.) Plaintiffs concede that no such writing exists.

43. Finally, Plaintiffs' argument that their shares have not yet been purchased by Cherry Oil fares no better. As explained above, the very existence of the Put/Call Provision precludes Plaintiffs from effectively initiating a claim for statutory dissolution. To be sure, Plaintiffs are entitled to the benefit of their bargain under the Put/Call Provision and possess legal remedies if Cherry Oil does not comply with its obligations under the buy-out provision. But those remedies are separate from a statutory claim for dissolution.

44. Accordingly, Defendants' Motion to Dismiss Plaintiffs' first cause of action in the SAC seeking dissolution of Cherry Oil pursuant to N.C.G.S. § 55-14-30(2)(ii) and (iv) is GRANTED, and the claim is DISMISSED without prejudice pursuant to Rule 12(b)(1).

**B.    Claim for Removal of Jay and Ann as Directors of Cherry Oil**

45. Plaintiffs' eighth cause of action is a derivative claim seeking the removal of Jay and Ann as Directors of Cherry Oil. (ECF No. 48, at ¶¶ 150–55.)

46.     N.C.G.S. § 55-8-09—titled "Removal of directors by judicial proceeding"—provides, in pertinent part:

> (a) The superior court . . . may remove a director of the corporation from office in a proceeding commenced . . . by its shareholders holding at least ten percent (10%) of the outstanding shares of any class if the court finds that:
>     (1) The director engaged in fraudulent or dishonest conduct, or gross abuse of authority or discretion, with respect to the corporation; and
>     (2) Removal is in the best interest of the corporation.

N.C.G.S. § 55-8-09(a)(1)–(2).  The Official Comment to this section further provides:

> The purpose of [§ 55-8-09] is to permit the prompt and efficient elimination of dishonest directors.  It is not intended to permit judicial resolution of internal corporate struggles for control except in those cases in which a court finds that the director has been guilty of wrongful conduct of the type described.

*Id.* at cmt. 2.

47.     Defendants argue that Plaintiffs' removal claim should be dismissed because Plaintiffs have neither "alleged any fraudulent or dishonest conduct, or gross abuse by either Jay or Ann that could justify their removal as directors" nor have they alleged "any fact suggesting that removal of Jay or Ann would be in the best interest" of Cherry Oil.  (ECF No. 50, at p. 10.)

48.     In response, Plaintiffs contend that they "sufficiently allege specific instances of fraudulent or dishonest conduct," "gross abuse of authority or discretion," and "facts showing that removal of Jay or Ann would be in the best interest" of Cherry Oil.  (ECF No. 52, at pp. 8–9 (referring to ECF No. 48, at ¶¶ 57, 59, 61, 63, 80–84, 90–91, 144, and 152).)

49. The Court, having thoroughly reviewed the allegations in the SAC, finds that Plaintiffs have failed to sufficiently allege conduct that is fraudulent or dishonest or conduct that constitutes a gross abuse of authority or discretion that is sufficient to warrant Jay and Ann's removal from the Board. Nor does the SAC contain anything other than merely conclusory allegations that the removal of Jay and Ann as directors would be in the best interests of Cherry Oil. Therefore, these allegations fall short of stating a valid claim for the removal of Jay and Ann as Directors of Cherry Oil.

50. Accordingly, Defendants' Motion to Dismiss Plaintiffs' claim for removal of Jay and Ann as Directors of Cherry Oil is GRANTED, and the claim is DISMISSED with prejudice.

## C. Gross Negligence/Willful Misconduct

51. Plaintiffs' fifth cause of action is a derivative claim for "gross negligence/willful misconduct" against Jay and Ann. (ECF No. 48, at ¶¶ 139–41.) Plaintiffs allege, *inter alia*, that Jay and Ann "engag[ed] in willful, wanton, and reckless misconduct in the management and exercise of de facto control over Cherry Oil." (*Id.* at ¶ 141.)

52. Defendants argue that this claim should be dismissed because "Plaintiffs have failed to allege any intentional misconduct by Jay or Ann or injury to [Cherry Oil] caused by any such misconduct." (ECF No. 50, at p. 15.) In response, Plaintiffs assert that they have adequately alleged "intentional wrongdoing by Jay and Ann that rises to the standard for willful or wanton conduct"—pointing to what

they argue are allegations of "knowing and intentional bad acts committed by Jay and Ann, including those to exclude Plaintiffs from [Cherry Oil] and divert control of [Cherry Oil] for their own benefit." (ECF No. 52, at p. 24 (referring to ECF No. 48, at ¶¶ 57, 59, 65, 80–84, 90–91).)

53. Our Supreme Court "has often used the terms 'willful and wanton conduct' and 'gross negligence' interchangeably to describe conduct that falls somewhere between ordinary negligence and intentional conduct." *Yancey v. Lea*, 354 N.C. 48, 52 (2001).

54. Gross negligence is "wanton conduct done with conscious or reckless disregard for the rights and safety of others." *Id.* "The difference between ordinary negligence and gross negligence is substantial." *McDevitt v. Stacy*, 148 N.C. App. 448, 460 (2002) (quotations and citation omitted).

> An act or conduct rises to the level of gross negligence when the act is done purposely and with the knowledge that such act is a breach of duty to others, i.e., a *conscious* disregard of the [rights and] safety of others. An act or conduct moves beyond the realm of negligence when the *injury or damage* itself is intentional.

*Yancey*, 354 N.C. at 53 (emphasis and alterations in original) (citations omitted).

55. Our Supreme Court has also defined "willful negligence."

> An act is done willfully when it is done purposely and deliberately in violation of law or when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason. The true conception of wil[l]ful negligence involves a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract, or which is imposed on the person by operation of law.

*Id.* at 53 (cleaned up) (quoting *Foster v. Hyman*, 197 N.C. 189, 191 (1929)).

56.     Here, the SAC's allegations simply do not support a claim for gross negligence or willful misconduct.  Plaintiffs have not alleged conduct that satisfies the elements applicable to this cause of action.  Accordingly, Defendants' Motion to Dismiss Plaintiffs' fifth cause of action in the SAC for gross negligence/willful misconduct is GRANTED, and the claim is DISMISSED with prejudice.

## D.     Claims for Breach of Fiduciary Duty

57.     Plaintiffs have alleged claims against Jay and Ann both derivatively and individually for breach of fiduciary duty.  (ECF No. 48, at ¶¶ 104–19, 142–45.)

58.     To successfully plead a breach of fiduciary duty claim, "a plaintiff must show that: (1) defendant owed plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff."  *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019) (citation omitted).

59.     As noted above, Plaintiffs have brought both derivative *and* individual breach of fiduciary duty claims against Jay and Ann.  "A derivative proceeding is a civil action brought in the right of a corporation"—*i.e.*, the claim is on behalf of the corporation for alleged injury to the corporation—while "an individual action is brought to enforce a right which belongs to a plaintiff personally"—*i.e.*, the claim is made directly by the plaintiff (shareholder) for alleged injury to the plaintiff.  *Hayes*, 248 N.C. App. at 577 (cleaned up); *see Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 660 (1997) (explaining that corporate shareholders "generally may not bring

individual actions to recover what they consider their share of the damages suffered by the corporation").

60. Before addressing the specific breach of fiduciary duty claims asserted by Plaintiffs in this action, it is helpful to review some of the basic principles that govern the Court's analysis.

61. "Under North Carolina law, a fiduciary relationship is defined as "one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Dalton v. Camp*, 353 N.C. 647, 651 (2001) (internal quotations omitted).

62. As fiduciaries to a corporation, corporate officers and directors "must discharge their duties in good faith, with due care, and in a manner they believe to be in the corporation's best interests." *Hayes*, 248 N.C. at 577. Thus, "corporate directors and officers act in a fiduciary capacity in the sense that they owe the corporation the duties of loyalty and care." *Seraph Garrison, LLC v. Garrison*, 247 N.C. App. 115, 119 (2016) (citations omitted).[6]

63. "The standard of conduct applicable to officers and directors is subject to review under the business judgment rule." *Adum v. Albermarle Plantation Prop. Owners Ass'n*, 2021 NCBC LEXIS 6, at **38 (N.C. Super. Ct. Jan. 19, 2021); *see also*

---

[6] *See* ROBINSON ON NORTH CAROLINA CORPORATION LAW § 14.03–04 (describing the duty of care as an obligation to act "with the care an ordinarily prudent person in a like position would exercise in like circumstances" and the duty of loyalty as an obligation to act "in a manner the director reasonably believes to be in the best interest of the corporation" and not "for personal gain to the detriment of the corporation").

*Technik v. WinWholesale, Inc.*, 2012 NCBC LEXIS 5, at **13 (N.C. Super. Ct. Jan. 13, 2012).  Our Court of Appeals has explained the rule as follows:

> The business judgment rule operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.

*Garrison*, 247 N.C. App. at 122 (citation omitted).  "In order to defeat this presumption and survive a motion to dismiss, [p]laintiff must allege in other than conclusory terms that the board [or officer] was inattentive or uninformed, acted in bad faith, or that the board's [or officer's] decision was unreasonable."  *Coleman v. Coleman*, 2015 NCBC LEXIS 114, at **18–19 (N.C. Super. Ct. Dec. 10, 2015) (citation omitted); *see also Adum*, 2021 NCBC LEXIS 6, at **39.

64.    Nevertheless, "the protection . . . afforded by the business judgment rule does not apply where the plaintiff has made an adequate showing that the directors breached their duty of loyalty . . . by having . . . engaged in self-dealing[.]"  *Vernon v. Cuomo*, 2009 NCBC LEXIS 1, at **38 (N.C. Super. Ct. Mar. 17, 2009) (citation omitted).

65.    With respect to the fiduciary duties owed by a majority shareholder to a minority shareholder,

> in closely-held corporations, "[t]he devolution of unlimited power imposes on holders of the majority of the stock a correlative duty, the duty of a fiduciary or agent, to the holders of the minority of the stock, who can act only through them -- the duty to exercise good faith, care, and diligence to make the property of the corporation produce the largest

possible amount, to protect the interests of the holders of the minority of the stock, and to secure and pay over to them their just proportion of the income and of the proceeds of the corporate property."

*Thomas v. McMahon,* 2015 NCBC LEXIS 67, at **27–28 (N.C. Super. Ct. June 23, 2015) (quoting *Loy v. Lorm Corp.,* 52 N.C. App. 428, 432–33 (1981)).

66.   With these principles in mind, the Court turns to Plaintiffs' claims for breach of fiduciary duty.  The Court will first address the derivative claim and then the individual claim.

67.   Plaintiffs' sixth cause of action is a derivative claim on behalf of Cherry Oil for breach of fiduciary duty against Jay and Ann as directors and officers of Cherry Oil.  (ECF No. 48, at ¶¶ 142–45.)  Plaintiffs allege, *inter alia,* that Jay and Ann have breached their fiduciary duty of care and loyalty to Cherry Oil by "devaluing and undermining the success and viability of Cherry Oil"; by "exclud[ing] . . . Plaintiffs from management and operation of Cherry Oil"; and by "causing Cherry Oil's [ ] legal counsel to act in Jay and Ann's narrow and specific interest."  (*Id.* at ¶ 144.)

68.   Defendants argue that this claim should be dismissed because Plaintiffs have failed to allege that they engaged in conduct that breached a fiduciary duty they owed to Cherry Oil.  (ECF No. 50, at p. 11).

69.   Based on the Court's exhaustive review of the allegations in the SAC, the Court concludes that the Plaintiffs' derivative breach of fiduciary duty claim against Jay and Ann fails as a matter of law.

70. First, Plaintiffs' allegations that Defendants' actions have harmed or "devalued" Cherry Oil are belied by Plaintiffs' own admission that "[t]oday, Cherry Oil and—more broadly—Cherry Energy are successful" and that "Cherry Energy is within months of being totally debt free . . . and is posting returns that are nearly double that of its [n]ational peer group, and has healthy cash reserves." (ECF No. 48, at ¶¶ 31, 33.)

71. Second, conspicuously absent from the SAC are allegations of financial self-dealing,[7] theft, fraud, or usurpation of corporate opportunities by the Cherrys. Such allegations are typical in claims that have survived a Rule 12(b)(6) motion. *See, e.g.*, *Bandy v. A Perfect Fit for You, Inc.*, 2018 NCBC LEXIS 21, at \*14–15 (N.C. Super. Ct. Mar. 7, 2018) (denying motion to dismiss breach of fiduciary duty claim where allegations included a sole director's failure to stop the corporation "from making fraudulent Medicaid reimbursement claims" and engaging in "self-dealing transactions to transfer money from [the corporation] to herself"); *SCA-Blue Ridge, LLC v. WakeMed*, 2016 NCBC LEXIS 2, at \*\*25–26 (N.C. Super. Ct. Jan. 4, 2016) (denying motion to dismiss breach of fiduciary duty claim where partnership's controlling member was "presented . . . with an opportunity to negotiate the possible purchase" of a competitor on behalf of the partnership, but instead purchased the competing entity for itself).

---

[7] The Court's conclusion in its prior Order and Opinion on Plaintiffs' Motion to Disqualify concerning one of Plaintiffs' earlier pleadings applies with equal force here: "[a]lthough the [SAC] uses the term 'self-dealing' on a number of occasions in its characterization of the Cherrys' conduct [ ], the supporting allegations reveal that they are not alleging actual self-dealing in its traditional sense." *Mauck v. Cherry*, 2021 NCBC LEXIS 81, at \*\*22 (N.C. Super. Ct. Sept. 20, 2021).

72. Third, Plaintiffs' assertion that their removal from management roles at Cherry Oil was not in the best interests of the corporation, without more, reflects only a subjective belief that cannot serve as a basis for their derivative breach of fiduciary duty claim. Likewise, their assertion that the Cherrys are wrong in their belief that Jason is deserving of a position of control within Cherry Oil simply reflects a difference of opinion rather than evidence of a breach of fiduciary duty.

73. Fourth, although the SAC makes the blanket assertion that Defendants "failed to exercise good faith, care, and diligence to make Cherry Oil's assets and opportunities produce the largest possible profit," (*Id.* at ¶ 61), mere conclusory allegations are insufficient to survive a Rule 12(b)(6) motion.

74. Moreover, the bulk of the allegations that *are* pled with specificity simply involve Plaintiffs' disagreement with decisions made by Defendants that are within the ambit of the business judgment rule.

75. Indeed, a number of the incidents of mismanagement by Jay and Ann alleged in the SAC simply reflect matters of routine business judgment. For example, the SAC references the loss of the company's best propane driver and the rehiring of a less dependable one; decisions to allow fuel to be delivered to high-risk customers; and an occasion on which Jason and Jay decided not to return a call from a customer.

76. Such contentions reflect corporate conduct that is typically protected by the business judgment rule, *see e.g., Coleman*, 2015 NCBC LEXIS 114, at \*19 (finding allegation that directors' replacement of the president of a corporation with a person who "does not have the requisite expertise or experience," without more, to be

"insufficient to demonstrate that the board's actions were outside the realm of the business judgment rule); *Technik*, 2012 NCBC LEXIS 5, at **15–16 (finding allegations that the board mismanaged the president's termination and replacement described nothing more than "routine conduct for directors engaged in fundamental business decision making" and was therefore subject to the business judgment rule), and fall far short of the sort of conduct that is required to make out a claim for breach of fiduciary duty. *See, e.g., Miller v. Burlington Chem. Co., LLC*, 2017 NCBC LEXIS 6, at *35 (N.C. Super. Ct. Jan. 27, 2017) (denying motion to dismiss based on allegations that manager "fail[ed] to take appropriate action to collect" a $324,000 account receivable and $1.5 million due under a purchase agreement).

77. Accordingly, Defendants' Motion to Dismiss Plaintiffs' derivative claim for breach of fiduciary duty is GRANTED, and the claim is DISMISSED with prejudice.

78. The Court reaches a different conclusion, however, with regard to Plaintiffs' individual claim for breach of fiduciary duty against Jay and Ann as majority shareholders of Cherry Oil. (ECF No. 48, at ¶¶ 104–19.)

79. In their briefs, Defendants repeatedly argue that Plaintiffs' individual breach of fiduciary duty claim is foreclosed by the existence of the Put/Call Provision in the Shareholders' Agreement. However, unlike Plaintiffs' dissolution claim, the existence of the Put/Call Provision does not serve as a *per se* bar to Plaintiffs' right to assert a breach of fiduciary duty claim individually. Although Defendants contend that the Shareholders' Agreement "established an alternative, bargained-for

procedure for protecting the rights of minority shareholders" and that Plaintiffs "should [not] be permitted to circumvent [this] procedure" by bringing breach of fiduciary duty claims (ECF No. 50, at p. 11), nothing in the Shareholders' Agreement purports to waive any fiduciary duties existing between the shareholders.

80.     As discussed above, it is abundantly clear that under North Carolina law the Cherrys, as majority shareholders, owed a fiduciary duty to the Maucks, as minority shareholders. *See, e.g., Raymond James Capital Partners, L.P. v. Hayes*, 248 N.C. App. 574, 580 (2016) (recognizing that "a controlling shareholder owes a fiduciary duty to minority shareholders").

81.     While the Court agrees with Defendants that the Put/Call Provision precludes Plaintiffs from relying on a "reasonable expectations" theory as the basis for their individual breach of fiduciary duty claim, the Court is satisfied that other allegations in the SAC state a valid individual claim for breach of fiduciary duty.

82.     For example, the SAC alleges that Defendants engaged in conduct such as hiding corporate records from Plaintiffs; excluding them from essential communications; failing to give them proper notice of meetings; secretly attempting to undermine their work; continuing to rely on outdated personal guaranties executed by Plaintiffs in the course of Defendants' dealings with creditors despite having removed Plaintiffs from their roles at Cherry Oil; falsely representing to vendors without Plaintiffs' consent that Plaintiffs had authorized certain transactions; ignoring Plaintiffs' rights under the Shareholders' Agreement; and seeking to remove Plaintiffs from the Board in an improper manner.

83.    Such allegations are sufficient to permit Plaintiffs' individual claim for breach of fiduciary duty to survive dismissal under Rule 12(b)(6).  *See, e.g.*, *Technik*, 2012 NCBC LEXIS 5, at **16–17 (allowing individual breach of fiduciary duty claim to survive Rule 12(b)(6) scrutiny where plaintiff alleged that he was excluded from board and shareholder meetings).    Therefore, Defendants' Motion to Dismiss Plaintiffs' second cause of action in the SAC for breach of fiduciary duty is DENIED.

**E.    Constructive Fraud**

84.    Plaintiffs assert claims for constructive fraud both individually and derivatively.  (ECF No. 48, at ¶¶ 104–19, 146–49.)

85.    It is well established that "a cause of action for constructive fraud must allege: (1) a relationship of trust and confidence; (2) that the defendant took advantage of that position of trust in order to benefit himself; and (3) that plaintiff was, as a result, injured."  *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293 (2004).  "[A]n essential element of constructive fraud is that 'defendants sought to benefit themselves' in the transaction."  *Piles v. Allstate Ins. Co.*, 187 N.C. App. 399, 406 (2007) (quoting *Barger*, 346 N.C. at 667).  This Court has recently observed that "[c]onstructive fraud and breach of fiduciary duty are similar but separate claims in North Carolina.  The primary difference between the two claims is that constructive fraud requires that the defendant benefit himself."  *Oliver v. Brown & Morrison, Ltd.*, 2022 NCBC LEXIS 20, at **25 (N.C. Super. Ct. Mar. 3, 2022).

86.    Although the Court has determined that Plaintiffs have adequately pled their individual breach of fiduciary duty claim, the Court nevertheless concludes that

both Plaintiffs' individual and derivative claims for constructive fraud fail as a matter of law because Plaintiffs have failed to allege that Jay or Ann benefited from their alleged misconduct.

87.     Plaintiffs argue that they have properly alleged the existence of such a personal benefit to Jay and Ann in two ways.  First, Plaintiffs contend that Jay and Ann have received estate planning benefits by laying the groundwork for their son Jason to succeed them in the management of Cherry Oil.  Second, Plaintiffs assert that the shifting of assets away from entities owned equally by the Maucks and Cherrys (*i.e.* C-GAS and AJAL) to Cherry Oil, in which the Cherrys have a controlling interest, was to their own benefit.  (ECF No. 52, at pp. 15–16.)

88.     With regard to the "estate planning" argument, even assuming, without deciding, that the "personal benefit" element of a constructive fraud claim can be non-monetary, the Court is not persuaded that the elimination of rivals to Jason for the future control of Cherry Oil is the type of benefit that may support a claim for constructive fraud.  Indeed, if anything, such a benefit would accrue to *Jason* rather than to the Cherrys.  Further, Plaintiffs cite to no authority—and this Court is aware of none—that has recognized such a "benefit" as being sufficient to support a claim for constructive fraud.

89.     With regard to Plaintiffs' second argument, Plaintiffs have failed to adequately allege just how the shifting of assets from other entities under the umbrella of Cherry Energy constitutes tortious conduct.  Thus, any "benefit" the

Cherrys received from such conduct cannot serve as the basis for a claim for constructive fraud under these circumstances.

90. Accordingly, Defendants' Motion to Dismiss Plaintiffs' claims for constructive fraud is GRANTED, and the claims are DISMISSED with prejudice. *See Barger*, 346 N.C. at 666–67 (affirming trial court's dismissal of constructive fraud claim where plaintiffs did not allege "that defendants sought to benefit themselves").

**F. Breach of Contract—Transfer of 30 Shares of Cherry Oil to Armistead**

91. The SAC contains two distinct breach of contract claims, which the Court will analyze separately.

92. The first of these two claims is brought against Jay by Armistead in Plaintiffs' third cause of action. In this claim, Armistead contends that Jay has breached an alleged 2010 oral agreement between them that "additional shares of Cherry Oil would be transferred from Jay to Armistead to reflect the value of [an] acquisition [by] Cherry Oil" in conformance with a separate 1995 oral agreement in which they "agreed that any new or expanded businesses would be owned 50-50." (ECF No. 48, at ¶¶ 120–32.) In connection with this claim, Armistead asserts that, over the years, Jay made "repeated statements of intention" to transfer an additional 30 shares of Cherry Oil to Armistead. (*Id*. at ¶ 122–23, 132.) Plaintiffs contend that these "repeated statements of intention" are evidenced by a 5 August 2019 memo drafted by Cherry Oil counsel stating, in pertinent part:

> Jay would like to "transfer" 30 shares of Cherry Oil to Arm[istead]. . . . The transfer of 30 shares from Jay to Arm[istead], for transfer tax purposes, would probably be a gift. Actually the transfer is

being made to "square up" the DM Price transaction. In that regard, Jay has no "donative intent" with respect to Arm[istead].

(ECF No. 48.7, at ¶ 5.)

93. Defendants argue that this claim should be dismissed because it is time-barred by the three-year statute of limitations for breach of contract claims. In response, Plaintiffs contend that the oral agreement between Jay and Armistead did not establish a specific date as to when the transfer of shares would take place and that Armistead's delay in bringing this claim was reasonable. In support of this contention, Plaintiffs cite to the proposition that "[i]f no time for the performance of an obligation is agreed upon by the parties, then the law prescribes that the act must be performed within a reasonable time." *Int'l Minerals & Metals Corp. v. Weinstein*, 236 N.C. 558, 561 (1930) (involving a dispute over an indefinite delivery date in a contract for the sale of goods).

94. Plaintiffs further assert that the claim could not have accrued any earlier than 17 July 2020— the date on which Plaintiffs claim Jay repudiated the contract by informing Armistead that "we need to develop a plan for you to transition out of ownership of Cherry Oil, C-Gas and AJAL." (*See* ECF No. 48, at ¶ 129.)

95. Our General Statutes establish a three-year statute of limitations for actions "[u]pon a contract, obligation, or liability arising out of a contract, express or implied[.]" N.C.G.S. § 1-52(1); *see also* N.C.G.S. § 1-15(a) ("Civil actions can only be commenced within the periods prescribed in this Chapter, after the cause of action has accrued, except where in special cases a different limitation is prescribed by statute.") Our appellate courts have made clear that

[t]he accrual of the cause of action must therefore be reckoned from the time when the first injury was sustained. . . . When the right of the party is once violated, even in ever so small a degree, the injury, in the technical acceptation of that term, at once springs into existence and the cause of action is complete.

*Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C.,* 180 N.C. App. 257, 262 (2006) (quoting *Mast v. Sapp*, 140 N.C. 533, 537–40 (1906); *see also Christenbury*, 370 N.C. at 6 ("A cause of action is complete and the statute of limitations begins to run upon inception of the loss from the contract, generally the date the promise is broken.").

96. Applying these principles here and giving the SAC its most charitable reading, the Court is not persuaded by the argument that the "breach" did not occur until ten years later upon Jay writing to Armistead on 17 July 2020 that "we need to develop a plan for you to transition out of ownership of Cherry Oil, C-Gas and AJAL." Rather, the claim accrued years earlier based on Jay's failure to transfer the shares pursuant to the alleged agreement.

97. Second, the Court is likewise unpersuaded that Armistead's delay of eleven years in asserting this claim was "reasonable" under the circumstances. The Court is guided by our Supreme Court's decision in *Christenbury* on this issue. In *Christenbury*, the plaintiff, a professional association providing ophthalmology services, purchased a "generalized software platform" with the intent of working with defendants, a consultant and his medical software company, to "customize and enhance the platform for plaintiff's practice needs and for possible sale to other physician practices and customers." 370 N.C. at 2. The parties entered into an

"Agreement Regarding Enhancements" where, "[a]s consideration for the assignment of rights" to the enhanced software, defendants agreed: to pay [plaintiff] a royalty of ten percent (10%) of the gross amount of all fees . . . received" from any sales of the enhanced software; to "provide [plaintiff] with a written report on a monthly basis . . . includ[ing] a detailed description of the fees received from [defendants'] Customers during the prior month, along with payment to [plaintiff] of all corresponding fees due"; to pay plaintiff "a minimum royalty in the amount of Five Hundred Dollars ($500.00) each year for the first five years"; and to not sell the enhanced software to customers in North Carolina or South Carolina without plaintiff's written consent. *Id*. at 2–3 (alterations in original). Although the defendant never performed any of their obligations under the agreement, plaintiff did not raise any concerns over the defendants' non-performance until fourteen years later, when it brought suit against defendants for breach of the contract. *Id*. at 3. The Supreme Court affirmed the trial court's dismissal of this claim on the ground that it was time-barred.

> While a party is duty bound to honor its contractual obligations, statutes of limitation operate inexorably without reference to the merits of a cause of action, thereby preventing surprise through the revival of claims that have been allowed to slumber. Plaintiff's complaint reveals that plaintiff had notice of its injury over fourteen years ago, well before commencing its current action. Whatever rights existed, plaintiff's fourteen-year slumber resulted in their becoming stale.

*Id*. at 9. Here, just as the claim in *Christenbury* was found to be stale after fourteen years, the Court concludes that Plaintiffs' claim is similarly stale given Armistead's eleven-year delay in bringing suit to enforce the oral agreement.

98.     Finally, Plaintiffs argue that Jay should be equitably estopped from asserting a statute of limitations defense based on his "repeated assurances" that he would transfer additional shares to Armistead.  (ECF No. 52, at pp. 16–21.)

99.     To properly plead equitable estoppel, Plaintiff must allege facts showing:

> (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) an intention or expectation that such conduct shall be acted upon by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; and (3) knowledge, actual or constructive, of the real facts.

> In addition, Defendants must also plead: (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially.

*Synovus Bank v. Parks*, 2013 NCBC LEXIS 36, at **27–28 (N.C. Super. Ct. July 30, 2013) (cleaned up).  "The basic question in determining whether an estoppel exists is whether . . . defendant's actions have lulled plaintiff into a false sense of security and so induced him not to institute suit in the requisite time period."  *Turning Point Indus. v. Global Furn., Inc.*, 183 N.C. App. 119, 125 (2007) (cleaned up).

100.    The Court has carefully reviewed the caselaw from North Carolina's appellate courts and concludes that the SAC fails to contain sufficient allegations to support Plaintiffs' assertion of equitable estoppel. Indeed, Plaintiffs' invocation of equitable estoppel in its response brief appears to be little more than an afterthought. A careful reading of the SAC reveals that Plaintiffs' allegations as to Jay's repeated

assurances of his intent to transfer the shares were pled simply to support the argument that a breach of contract claim did not accrue until Jay's repudiation in July of 2020.[8] The SAC simply does not contain allegations supporting the proposition that Armistead's reliance on such statements from Jay deterred him from filing a lawsuit to enforce the promise in the years prior to 2021. *See Ussery v. Branch Banking & Trust Co.*, 227 N.C. App. 434, 443–46 (holding that defendant was equitably estopped from asserting the running of the applicable statute of limitations where defendant told plaintiff to "hold off on instituting any action" on the theory that "everything would be worked out").

101. Although "magic words" need not be employed in order to assert the doctrine of equitable estoppel, the pleading must contain sufficient language to make clear that such a "claim" is, in fact, being asserted. This was not done in the present case.

102. Accordingly, Defendants' Motion to Dismiss Plaintiffs' third cause of action in the SAC for breach of contract is GRANTED, and the claim is DISMISSED with prejudice.

### G. Breach of Contract – Shareholders' Agreement

103. Plaintiffs' second breach of contract claim, which is brought against all Defendants, is premised upon their allegations that Defendants are in breach of the Put/Call Provision of the Shareholders' Agreement. (ECF No. 48, at ¶¶ 156–64.)

---

[8] Indeed, rather than contending that Jay's assurances that he would transfer the shares were designed to induce Armistead to forego bringing suit until it was too late to assert such a claim, Plaintiffs allege that "[i]t was typical of Jay to delay in performing share-transfer obligations[.]" (*See* ECF No. 48, at ¶ 124.)

104. In support of this claim, Plaintiffs allege the following: (1) on 16 June 2021, Defendants "called" Plaintiffs' shares pursuant to the Put/Call Provision (*Id.* at ¶ 158); (2) Defendants noticed a closing date for 13 August 2021, but then cancelled "in light of [Plaintiffs'] disagreement concerning the price representing the valuation" of Plaintiffs' shares (*Id.* at ¶ 159; Ex. W, ECF No. 48.27); (3) since that time, Defendants "have failed and refused to take any steps necessary to close the transaction" (ECF No. 48, at ¶ 160); and (4) "[Defendants] have repeatedly purported to exercise rights they contend arise under the Shareholder[s'] Agreement, including—without limitation—the purported right to vote [Plaintiffs'] shares" (*Id.* at ¶ 161). Based on these allegations, Plaintiffs assert that Defendants' "failures to take reasonable and necessary steps to complete the call transaction while exercising dominion and control over [Plaintiffs'] shares is a breach of the Shareholder[s'] Agreement." (*Id.* at ¶ 163.)[9]

105. Defendants contend that this claim should be dismissed because (1) it is Plaintiffs—not Defendants—who have prevented Cherry Oil from going forward with the purchase of the Maucks' shares pursuant to the process set out in the Put/Call Provision; and (2) the Shareholders' Agreement expressly gives Jay and Ann the right to vote Armistead and Louise's shares once their shares have been "called." (ECF No. 50, at p. 23.)

---

[9] The Court observes that Plaintiffs' arguments are, at times, conflicting. On the one hand, they contend that their shares were never properly "called" under the Put/Call Provision because invalid notice was given to them of the 16 June 2021 shareholders and directors meetings in which the call vote occurred. On the other hand, they nevertheless contend that Defendants are in breach of the Shareholders' Agreement by failing to go forward with the procedure set out in the Put/Call Provision.

106. The Court concludes that Plaintiffs have pled a valid claim for breach of the Put/Call Provision in that they have alleged Defendants obtained the benefit of that provision by assuming control over Plaintiffs' shares without taking the required steps to actually purchase those shares as set out in the Shareholders' Agreement. Plaintiffs contend that this has left them in a state of limbo, in which they still technically own their shares, but have no authority over how they are voted. The parties blame each other for the failure to reach an agreement regarding the purchase of Plaintiffs' shares based on the procedure set out in the Shareholders' Agreement, and their respective arguments make clear that a factual dispute exists on this issue. The Court cannot resolve that dispute at the pleadings stage.

107. Accordingly, Defendants' Motion to Dismiss Plaintiffs' ninth cause of action in the SAC for breach of contract is DENIED.

### H. Constructive Trust

108. Finally, the SAC purports to state a claim for "constructive trust." (ECF No. 48, at ¶¶ 133–38.) As Plaintiffs concede, a constructive trust is a *remedy* rather than a standalone claim. *See Barefoot v. Barefoot*, 2022 NCBC LEXIS 8, at **34 (N.C. Super. Ct. Feb. 2, 2022). Accordingly, this purported "claim" should be dismissed "without prejudice to [Plaintiffs'] right to seek a constructive trust as a remedy [on] their surviving claims for relief." *LLG-NRMH, LLC v. Northern Riverfront Marina & Hotel, LLLP*, 2018 NCBC LEXIS 105, at *15 (N.C. Super. Ct. Oct. 9, 2018).

109. Therefore, Defendants' Motion to Dismiss Plaintiffs' purported claim for "constructive trust" is GRANTED without prejudice to Plaintiffs' right to pursue a

constructive trust remedy should they ultimately prevail on a claim entitling them to such relief.

## CONCLUSION

THEREFORE, IT IS ORDERED that Defendants' Motion to Dismiss is **GRANTED**, in part, and **DENIED**, in part, as follows:

1. The Motion to Dismiss is **GRANTED** with respect to the following claims, which are hereby **DISMISSED WITHOUT PREJUDICE:**

   a. Plaintiffs' claim for dissolution of Cherry Oil; and

   b. Plaintiffs' claim for constructive trust.

2. The Motion to Dismiss is **GRANTED** with respect to the following claims, which are hereby **DISMISSED WITH PREJUDICE**:

   a. Plaintiffs' claim for removal of Jay and Ann Cherry as directors of Cherry Oil;

   b. Plaintiffs' claim for gross negligence/willful misconduct;

   c. Plaintiffs' derivative claim for breach of fiduciary duty;

   d. Plaintiffs' individual and derivative claims for constructive fraud; and

   e. Plaintiff Armistead Mauck's claim against Defendant Jay Cherry for breach of contract.

3. The Motion to Dismiss is **DENIED** with respect to the following claims:

   a. Plaintiffs' individual claim for breach of fiduciary duty; and

b. Plaintiffs' claim for breach of contract based on the alleged breach of the Put/Call Provision of the Shareholders' Agreement.

SO ORDERED, this the 2nd day of May, 2022.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases